THOMAS GORE ET AL. *v.* PEOPLE'S
SAVINGS BANK ET AL.
(15042)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued June 1—decision released October 10, 1995

*Peter J. Dauk,* with whom was *Lawrence F. Reilly,* for the appellants (defendants).

*Dana P. Lonergan,* for the appellees (plaintiffs).

*William H. Champlin III* filed a brief for the American Insurance Association as amicus curiae.

*Kenneth G. Williams* and *Renee W. Dwyer* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Janet C. Spegele* and *Stephen Ostrach* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Kathryn Calibey* and *Joram Hirsch* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

KATZ, J. The primary question on this certified appeal is whether the Appellate Court properly concluded that a landlord of a residential dwelling may be held strictly liable pursuant to General Statutes (Rev. to 1985) §§ 47a-7, 47a-8 and 47a-54f (b)[1] for personal injuries

[1] General Statutes (Rev. to 1985) § 47a-7 provides in relevant part: "Landlord's responsibilities. (a) A landlord shall: (1) Comply with the requirements of chapter 368o and all applicable building and housing codes materially affecting health and safety of both the state or any political subdivision thereof; (2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition, except where the premises are intentionally rendered unfit or uninhabitable by the tenant, a member of his family or other person on the premises with his consent, in which case such duty shall be the responsibility of the tenant; (3) keep all common areas of the premises in a clean and safe condition; (4) maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances and elevators, supplied or required to be supplied by him; (5) provide and maintain appropriate receptacles for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit and arrange for their removal; and (6) supply running water and reasonable amounts of hot water at all times and reasonable heat except if the building which includes the dwelling unit is not required by law to be equipped for that purpose or if the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection." This section has remained unchanged since 1985.

General Statutes (Rev. to 1985) § 47a-8 provides: "Paint not conforming to standards renders property unfit. The presence of paint which does not conform to federal standards as required in accordance with the Lead-Based Paint Poisoning Prevention Act, Chapter 63 of the Social Security Act, as amended, or of cracked, chipped, blistered, flaking, loose or peeling paint which constitutes a health hazard on accessible surfaces in any dwelling

sustained by a minor tenant due to the minor's exposure to lead-based paint in the landlord's dwelling. The plaintiffs, Thomas Gore and Wanda Copeland, brought an action on behalf of their minor son, Kendall Copeland, claiming, inter alia, that the defendants, People's Savings Bank and M.S.B. Real Estate Corporation, were strictly liable for the damages caused by their son's exposure to lead-based paint in the defendants' dwelling. The trial court, *Thim, J.,* granted the defendants' motion for a directed verdict on the strict liability count and, after the jury returned a verdict in favor of the defendants on the remaining counts, the court denied the plaintiffs' motion to set aside the verdict. The Appellate Court reversed the decision of the trial court, concluding that "§§ 47a-7 and 47a-8, when read together, and § 47a-54f provide for civil damages pursuant to a claim of strict liability" and, therefore, that the trial court should not have directed a verdict in favor of the defendants on the strict liability count. *Gore* v. *People's Savings Bank,* 35 Conn. App. 126, 644 A.2d 945 (1994). We granted the defendants' petition for certification to appeal; *Gore* v. *People's Savings Bank,* 231 Conn. 923, 648 A.2d 163 (1994); and now reverse and remand the case to the Appellate Court for further proceedings.

The jury reasonably could have found the following facts. In 1984, the plaintiffs and Kendall Copeland moved into an apartment located at 400 Atlantic Street in Bridgeport. On May 22, 1985, Audrey Gaines, a program coordinator for the Bridgeport department of

unit, tenement or any real property intended for human habitation shall be construed to render such dwelling unit, tenement or real property unfit for human habitation and shall constitute a noncompliance with subdivision (2) of subsection (a) of section 47a-7." This section was repealed, effective July 1, 1994. Public Acts 1994, No. 94-220, § 11.

General Statutes (Rev. to 1985) § 47a-54f (b) provides: "Paint on the accessible surfaces of a tenement house shall not be cracked, chipped, blistered, flaking, loose, or peeling so as to constitute a health hazard." This provision has remained unchanged since 1985.

health, inspected the plaintiffs' apartment for the presence of lead. Gaines tested the surfaces of the apartment using a portable X-ray machine, which measured the amount of lead within the paint on the surfaces. This testing revealed that some surfaces contained more than five tenths of 1 percent lead by weight, the federal statutory standard then codified in 42 U.S.C. § 4841[2] and incorporated by § 47a-8. On the basis of the results of this inspection, Gaines sent notification to the landlord[3] and requested that it abate the lead in the plaintiffs' apartment. On August 26, 1985, Gaines reinspected the apartment and determined that all lead hazards had been abated.

By amended complaint dated October 1, 1992, the plaintiffs brought an action against the defendants for injuries that Kendall had suffered due to his exposure to the lead-based paint. The plaintiffs claimed that the defendants negligently had failed to comply with certain state laws pertaining to the health and safety of tenants.[4] The plaintiffs also claimed that the defendants had failed to comply with the terms of their lease agreement requiring the defendants to comply with certain state laws pertaining to the health and safety of tenants.[5]

---

[2] Title 42 of the United States Code, § 4841 (3) (A) (1982) provides: "Except as provided in subparagraph (B), the term 'lead-based paint' means any paint containing more than five-tenths of 1 per centum lead by weight (calculated as lead metal) in the total nonvolatile content of the paint, or the equivalent measure of lead in the dried film of paint already applied, or both."

[3] Gaines apparently was unsure about who owned the building and sent the original notice, as well as further correspondence regarding the lead-based paint, to Attorney Lisa Paolini in Bridgeport.

[4] The plaintiffs alleged that the defendants had been negligent because they reasonably had failed "to inspect, properly detect and correct" the lead-based paint in the apartment, the presence of which constituted a health hazard under General Statutes §§ 47a-8, 47a-7 (a) (2) and 47a-54f (b), and § 19-13-B1 (i) of the Regulations of Connecticut State Agencies.

[5] They alleged violations of the same statutes at issue in the negligence counts. See footnote 4.

Finally, the plaintiffs alleged that the defendants were strictly liable for the damages caused by the lead-based paint violations. On October 20, 1992, after the close of evidence, the trial court granted the defendants' motion for a directed verdict on the strict liability count against each defendant.

With regard to the negligence counts, the trial court instructed the jury that the defendants were liable if, inter alia: (1) there was a violation of a warranty of habitability or state statute;[6] (2) the landlord had con-

---

[6] The trial court stated that "[t]he plaintiffs claim the landlord breached a warranty of habitability, which is set forth in the lease. They've also claimed that the landlord violated a State statute. Both the lease and the State statute provide or set forth what is often called a warranty of habitability. The relevant provision in the lease reads as follows: 'We,' and this refers to the landlord, and the landlord is the we, 'We will make all repairs and do whatever is necessary to put and keep the rental property in a fit and livable condition.' A State statute provides as follows: 'A landlord shall make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.' Both the lease and the state statute basically accomplish the same objective. They set forth what is called a warranty of habitability. . . .

"Now the first issue which you must decide is whether the plaintiffs have shown the landlord violated a warranty of habitability or a State statute. The plaintiffs, Mr. and Mrs. Gore, on behalf of their child, claim a lead-based paint hazard existed in the apartment in violation of the lease and the State statute. I have read the provisions of the lease and the State statute to you. You must, first of all, decide whether such a hazard existed, and, if so, whether the hazard violated the warranty. I don't think I need to read the warranty and the State statute over again; I think I've done that clearly. You must decide whether the warranty was breached.

"In this regard, you should be aware of the contents of another State statute, another statute, another law provides that 'the presence of paint on accessible surfaces, which does not conform to Federal standards, shall be construed to render the apartment unfit for human habitation and shall constitute a violation.' That's basically the language of the statute. Accessible surfaces, I would suggest, would include protruding paint surfaces such as windows and windowsills, the doors and door frames, corners, such surfaces which are within, you know, five feet from the floor, an area where a child could reach.

"The Federal standard requires 'all paint intended for residential surfaces must be formulated to contain more than—no more than five percent lead by weight in the dried film.' You've heard testimony on that issue.

"Now, I will repeat the relevant part of the statute. The State statute 'provides that the presence of paint on accessible surfaces which does not

structive or actual notice of the violation;[7] (3) the land-
lord had failed to repair the condition constituting the

conform to Federal standards shall be construed to render the apartment unfit for human habitation and shall constitute a violation of the warranty of habitation and fitness.

"There is another way in which the warranty may be violated. The State law goes on and provides that 'the presence of cracked, chipped, blistered, flaking, loose or peeling paint, which constitutes a health hazard on accessible surfaces, shall be construed to render the apartment unfit for human habitation and shall be a violation of the warranty.' Repeating that, the State law provides that 'the presence of cracked, chipped, blistered, flaking, loose or peeling paint, which constitutes a health hazard on accessible surfaces, shall be a violation.' You have heard evidence about the condition of the paint. You have heard various opinions. You must consider this evidence and all other relevant circumstances and decide whether the warranty of habitability was breached."

[7] The trial court stated that "[t]he second issue you must decide is whether the landlord had constructive notice of the violation or if the landlord did not, whether the landlord received actual notice of the violation. The violation would be the existence of lead-based paint in violation of the Federal statute standard, or it would be the presence of cracked, chipped, blistered, flaking, loose or peeling paint, which constitutes a health hazard. As to what would constitute a health hazard, you'll have to focus on the evidence. I think you've had testimony about the condition of the paint and also opinions.

"The plaintiffs claim that you should find the landlord had notice of the condition as early as the time as when they moved into the apartment. If you find the defective condition arose before the plaintiffs moved into the apartment, you must decide whether the landlord had constructive notice.

"Constructive notice is perhaps a legal concept, therefore, I will define it as it's legally defined. Constructive notice is defined as knowledge of conditions the landlord could have known about in the exercise of reasonable care. If the defective condition existed before the tenants moved into the apartment, the landlord, not the tenant, the landlord has the burden of showing, by the fair preponderance of the evidence, a lack of notice or knowledge of the condition. The landlord can meet this burden by showing that the landlord could not have known of the defect in the exercise of due care. A landlord who exercises reasonable or due care may not be held liable to a tenant for injuries that arise from a defective condition when the landlord neither knew of nor had reason to know about the defect.

"Elaborating further on this concept of constructive notice, I'd like to set forth the landlord's claim. The landlord claims that it was not aware of a lead-based paint hazard when the defendants took possession of the apartment. The landlord claims that a landlord of ordinary prudence, acting under the same or similar circumstances, would not have been aware of or would not have discovered a lead-based paint hazard. On this issue the landlord has the burden of proof. If you find the landlord did not have constructive notice at the time the tenants moved in, then you must go on and decide

violation within a reasonable time after receiving notice of the violation;[8] and (4) the landlord's failure to repair was a proximate cause of the plaintiffs' injuries. The trial court also instructed the jury that it would have in the jury room, and would be required to answer, interrogatories corresponding to these four issues, and, further, that a negative answer to any one of them would establish that the defendants were not liable. Following the jury charge, the plaintiffs excepted to, inter alia, the lack of a charge on negligence as a matter of law as had been set forth in their request to charge. At that time, the plaintiffs also renewed their objection to the granting of the defendants' motion for a directed verdict on the strict liability claim, and they excepted to the trial court's instruction regarding the notice requirement and the landlord's opportunity to repair within a reasonable period of time.

The jury found the defendants not liable, finding that there was a violation of a warranty or statute and that the defendants had actual or constructive notice of the violation, but that the defendants had repaired the condition constituting the violation within a reasonable period of time. The plaintiffs filed a motion to set aside the verdict, contending that the trial court had, inter

whether the landlord received actual notice. If a defective condition arose after the plaintiffs moved into the apartment, the plaintiffs must show, by a fair preponderance of the evidence that the landlord received actual notice of the condition. In this regard, you have heard testimony about a testing procedure . . . you've heard other evidence relevant to the issue of actual notice. On the issue of actual notice the plaintiffs have the burden of proof."

The trial court later clarified the burden of proof on this element, stating that "[t]he burden—the plaintiff bears the burden of proof on that point."

[8] The trial court stated that "[t]he law does not impose immediate and unconditional liability upon a landlord for violating a warranty of habitability. The landlord is liable only if repairs are not effected after actual or constructive notice of the defective reaches the landlord. What is a reasonable time for the landlord to correct a condition is a question of fact for you to decide. You should consider the evidence which you believe is relevant on the point including the danger involved when resolving this issue. And on the issue of what is a reasonable period of time, the plaintiffs have the burden of proof."

alia, improperly: (1) directed a verdict in favor of the defendants on the strict liability counts; (2) refused to give a negligence per se instruction regarding General Statutes §§ 47a-7 (a) (2), 47a-8, 47a-54f (b) and § 19-13-B1 (i) of the Regulations of Connecticut State Agencies; (3) instructed the jury that the plaintiffs had the burden of proof with respect to actual or constructive notice; and (4) instructed the jury that the defendants had a reasonable time after notice to repair the conditions constituting the violation. The trial court denied the motion to set aside the verdict, concluding that §§ 47a-7 and 47a-8 do not modify the common law requirement of notice and, therefore, do not impose strict liability on landlords.

The Appellate Court reversed the trial court's refusal to set aside the verdict, concluding that the trial court had improperly directed a verdict in favor of the defendants on the strict liability counts. *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 128–29. In doing so, the Appellate Court first determined that violations of §§ 47a-7 (a) (2), 47a-8 and 47a-54f (b)[9] constitute negligence per se for the purposes of a claim brought on behalf of a minor injured by lead-based paint in the landlord's apartment. Id., 132–34. In particular, the Appellate Court determined, on the basis of the language of these statutory provisions and their legislative history, that the provisions satisfied the two-prong test for negligence per se: (1) that the plaintiffs were within the class of persons protected by the statute; and (2)

---

[9] The Appellate Court stated that "[o]ur discussion of General Statutes § 47a-7 is limited to the specific interaction between General Statutes §§ 47a-8 and 47a-7. Our subsequent discussion, therefore, will focus on § 47a-8. Proof of a violation of § 47a-8 is a per se violation of § 47a-7." *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 130 n.5. Furthermore, it interpreted § 47a-54f within its analysis of § 47a-8, stating that "[t]he portion of § 47a-8 that prohibits certain peeling or flaking paint that constitutes a health hazard can be analyzed with § 47a-54f, which likewise prohibits cracked, chipped, blistered, flaking, loose, or peeling paint that constitutes a health hazard." Id., 133–34.

that the injury suffered is of the type that the statute was intended to prevent. Id., 130–34.[10] The Appellate Court then concluded that "[b]ecause we construe the statute as meeting the threshold dual criteria for imposition of statutory civil liability pursuant to negligence per se, but lacking any provision for an excuse for the violation, we conclude that the legislature intended that the statute provide for strict liability upon proof of a violation of the statute and proximate causation." Id., 135–36.

The Appellate Court noted that its interpretation followed the analysis utilized in *Housing Authority* v. *Olesen*, 31 Conn. App. 359, 363–65, 624 A.2d 920 (1993), in which the Appellate Court had determined that § 47a-8 did not require notice to the landlord of the lead-based paint violation to trigger a defense to the landlord's summary process action for nonpayment of rent. *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 135. Moreover, the Appellate Court recognized that the same conclusion regarding strict liability had previously been reached in the case of *Hardy* v. *Griffin*, 41 Conn. Sup. 283, 569 A.2d 49 (1989), although the *Hardy* court had analyzed the issue differently. *Gore* v. *People's Savings Bank*, supra, 136 n.11 ("our analysis is independent of that set forth in *Hardy*"). As a result, it remanded the case for a new trial. Id., 137.[11]

---

[10] The Appellate Court noted the distinction between negligence per se and strict liability, agreeing with the decision of then Superior Court Judge Berdon in *Vingiano* v. *Frisco*, Superior Court, judicial district of New Haven, Docket No. 240142 (June 23, 1986), that "the key difference between the imposition of negligence per se [as set forth in the Restatement (Second) of Torts] and strict liability . . . [is that] § 288A of the Restatement (Second) of Torts provide[s] excuses for violations of statutes under the doctrine of negligence per se, while there is no provision for excuses under the doctrine of strict liability." *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 132.

[11] Because the Appellate Court reversed the decision and remanded the case for a new trial on this basis, it did not reach the plaintiffs' other claims, including "whether the trial court improperly (1) instructed the jury that the plaintiffs had the burden of proof with respect to actual or constructive notice of the violation of the statute concerning lead paint, (2) instructed

After the Appellate Court heard oral argument, but before it released its decision in this case, the legislature repealed § 47a-8. See Public Acts 1994, No. 94-220, § 11. We granted the defendants' petition for certification to appeal from the decision of the Appellate Court, limited to the following two issues: "1. Did the Appellate Court properly conclude that the defendants' violation of General Statutes §§ 47a-7 and 47a-8 or § 47a-54f (b) imposed strict liability on the defendants for the minor plaintiff's injuries?" and "2. What is the effect of the enactment of Public Act No. 94-220 (11) on the liability of the defendants in this case?" *Gore* v. *People's Savings Bank*, supra, 231 Conn. 923.[12]

Before further framing the questions at issue in this case, we first emphasize what is not at issue. From the jury's answers to the interrogatories at trial following the trial court's instructions, it is clear that the jury found the condition of the plaintiffs' apartment to have been in violation of the defendants' duty to maintain the property. The jury also found either that the defendants had received constructive notice of this violation

the jury that the defendants were entitled to a reasonable time after notice to make the necessary repairs pursuant to General Statutes § 47a-7 (a) (2), and (3) refused to allow the plaintiffs to question a witness regarding the presence of lead-based paint in other apartments owned by the defendants." *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 128–29 n.4. Moreover, the Appellate Court did not independently analyze the plaintiffs' claim that the trial court had improperly failed to instruct the jury on the theory of nuisance, because "the issue of public nuisance was thrust into the complaint only to the extent that proof of a public nuisance . . . could constitute negligence per se or strict liability." Id.

[12] This case was argued before five members of this court on June 1, 1995. Thereafter, on July 24, 1995, the court decided, sua sponte, to consider this case en banc and ordered the parties to submit supplemental briefs limited to the following issue: "In light of cases such as *Chambers* v. *Lowe*, 117 Conn. 624, 169 A. 912 (1933), *Ziskin* v. *Confietto*, 137 Conn. 629, 79 A.2d 816 (1951), and *Panaroni* v. *Johnson*, 158 Conn. 92, 256 A.2d 246 (1969), does General Statutes (Rev. to 1985) § 47a-8 provide for liability of a landlord based upon the doctrine of negligence per se, irrespective of and as distinguished from whether it provides for such liability based on the doctrine of strict liability?"

prior to the plaintiffs' occupancy or had received actual notice at some time after the plaintiffs had moved into the apartment. Although the defendants contested these issues at trial, they do not now contend that there had been insufficient evidence at trial such that the jury could not have reasonably decided these issues as it did.

I

In deciding whether the Appellate Court properly concluded that these statutes impose strict liability on landlords such as the defendants, we must examine two broad areas of the law implicated by the issue: landlord-tenant law and general tort law. The defendants contend that, under common law principles of landlord premises liability, the burden is on the plaintiffs to prove not only that a condition in their apartment violated some common law or statutory duty to maintain the premises in a habitable condition, but also that the landlord had notice of the condition constituting the violation and had a reasonable time to repair the condition after receiving notice. In the defendants' view, and that of the trial court, because the provisions of §§ 47a-7, 47a-8 and 47a-54f do not expressly modify common law principles, these elements are a part of the plaintiffs' cause of action notwithstanding the statutory provisions.

The plaintiffs, on the other hand, concur with the Appellate Court's analysis of the case according to the general tort principles of negligence per se and strict liability. The Appellate Court concluded that a violation of §§ 47a-8 and 47a-54f constitutes negligence per se, and that, because these statutory provisions do not expressly provide landlords the opportunity for proving the "excuse" of lack of notice, landlords are strictly liable for damages resulting from the violations upon proof of proximate causation. *Gore* v. *People's Savings*

*Bank,* supra, 35 Conn. App. 136. The plaintiffs agree
with this analysis. In concluding as it did, however, the
Appellate Court did not address the analysis of the
trial court or otherwise reconcile the apparent conflict
between its analysis premised on negligence per se and
the trial court's approach premised on the common law
elements of landlord liability.

We conclude that, although the Appellate Court prop-
erly determined that the presence of lead paint in viola-
tion of §§ 47a-8 and 47a-54f constitutes negligence per
se,[13] these sections do not impose strict liability on
landlords. Rather, because these sections do not modify
the common law elements of landlord premises liability,
notice is relevant to a tenant's cause of action. Thus,
we reverse the Appellate Court's judgment and remand
the case to that court for consideration of the plaintiffs'
other claims.[14]

A

In determining whether a violation of § 47a-8 consti-
tutes negligence per se or provides a basis to subject

---

[13] The Appellate Court analyzed §§ 47a-8 and 47a-54f (b) together, conclud-
ing that the prohibitions in § 47a-54f (b) were similar to those in § 47a-8
related to "cracked, chipped, blistered, flaking, loose, or peeling paint." *Gore*
v. *People's Savings Bank,* supra, 35 Conn. App. 133–35; see footnote 1. We
discern no reason to disagree with this assessment. Indeed, we read the
Appellate Court's reliance on § 47a-54f (b) as merely indicating that court's
assessment that § 47a-8 makes a violation of § 47a-54f (b) also a violation of
§ 47a-7. Thus, we need analyze only § 47a-8, which discussion will necessarily
control the effect of § 47a-54f (b).

We disagree with the defendants that the plaintiffs have waived their right
to appellate review with respect to the trial court's decision to direct a verdict
on the strict liability count related to § 47a-54f (b). The defendants contend
that "the plaintiffs did not assign error to the direction of that verdict," but
the plaintiffs did object to the trial court's granting of the defendants' motion
for a directed verdict on the strict liability counts and the plaintiffs referenced
§ 47a-54f (b) in their motion to set aside the verdict.

[14] In this decision, we address only whether the Appellate Court properly
concluded that the trial court had improperly directed a verdict on the
plaintiffs' strict liability counts. In making this determination, we necessarily
must address the two issues considered in the Appellate Court's decision:

the landlord to strict liability, we must first discuss traditional principles of landlord premises liability. We have recognized that, under the common law, landlords have a duty to use reasonable care to maintain in a reasonably safe condition those areas of their premises over which they exercise control. *Cruz* v. *Drezek*, 175 Conn. 230, 234, 397 A.2d 1335 (1978); *Douglass* v. *95 Pearl Street Corp.*, 157 Conn. 73, 82, 245 A.2d 129 (1968); *Klahr* v. *Kostopoulos*, 138 Conn. 653, 654, 88 A.2d 332 (1952); see *State* v. *White*, 204 Conn. 410, 427, 528 A.2d 811 (1987). We stated in *Cruz* v. *Drezek*, supra, 235: "There could be no breach of the duty resting upon the [landlords] unless they knew of the defective condition or were chargeable with notice of it because, had they exercised a reasonable inspection of their premises, they would have discovered it; *Kirby* v. *Zlotnick*, 160 Conn. 341, 344, 278 A.2d 822 [1971]; *White* v. *E & F Construction Co.*, 151 Conn. 110, 112, 193 A.2d 716 [1963]." Thus, liability of a landlord for damages resulting from a defective condition in an area over which the landlord exercises control generally depends upon proof that the landlord received either actual or constructive notice of the condition prior to the time of the plaintiff's injuries. See, e.g., *Cruz* v. *Drezek*, supra, 235; *McCrorey* v. *Heilpern*, 170 Conn. 220, 221, 365 A.2d 1057 (1976); *White* v. *E & F Construction Co.*, supra, 112–13. Liability also usually depends upon proof that the landlord failed to remedy the defective situation in a reasonable period of time after receipt of notice. See *Sauro* v. *Arena Co.*, 171 Conn. 168, 170–71, 368 A.2d 58 (1976); *Long* v. *Savin Rock Amusement Co.*, 141 Conn. 150, 153, 104 A.2d 221 (1954).

---

(1) whether the trial court improperly refused to instruct the jury that, if it found the defendants in violation of §§ 47a-7, 47a-8 or 47a-54f, the defendants were negligent per se; and (2) whether the trial court improperly directed a verdict in favor of the defendants on the counts alleging strict liability. See *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 127–28. Thus, on remand, the Appellate Court will need to consider the three unresolved issues that had been raised by the plaintiffs. See id., 128 n.4.

Furthermore, we have recognized that, at common law, " 'there is no implied warranty of habitability given to a tenant, but rather, he takes the premises as he finds them and bears the risk of any defective conditions which are within the area under his exclusive possession and control. . . . "This rule, however, does not apply to defects which are the result of faulty design or disrepair and which existed at the beginning of the tenancy, were not discoverable by the tenant on reasonable inspection, and were known, either actually or constructively, to the landlord." ' *Thomas* v. *Roper*, [162 Conn. 343, 349–50, 294 A.2d 321 (1972)]." *Johnson* v. *Fuller*, 190 Conn. 552, 558, 461 A.2d 988 (1983). Thus, as a matter of common law, although landlords owe a duty of reasonable care as to those parts of the property over which they have retained control, landlords generally "[do] not have a duty to keep in repair any portion of the premises leased to and in the exclusive possession and control" of the tenant. *Thomas* v. *Roper*, supra, 348; accord *Pollack* v. *Gampel*, 163 Conn. 462, 468, 313 A.2d 73 (1972); *Dinnan* v. *Jozwiakowski*, 156 Conn. 432, 434–36, 242 A.2d 747 (1968). Thus, as a matter of common law, a tenant's claim for injuries caused by lead-based paint in the apartment would depend upon proof of control and actual or constructive notice of the conditions giving rise to the defective conditions caused by the lead-based paint. See *Cruz* v. *Drezek*, supra, 175 Conn. 235; *McCrorey* v. *Heilpern*, supra, 170 Conn. 221; *White* v. *E & F Construction Co.*, supra, 151 Conn. 112–13. Other courts have similarly concluded that a landlord's liability for damages caused by lead-based paint depends on proof of notice to the landlord. See, e.g., *Garcia* v. *Jiminez*, 184 Ill. App. 3d 107, 112, 539 N.E.2d 1356, appeal denied, 127 Ill. 2d 615, 545 N.E.2d 109 (1989) ("[landlord's] actual or constructive knowledge of the [lead paint] is required to establish liability"); *Brown* v. *Marathon Realty, Inc.*, 170 App.

Div. 2d 426, 427, 565 N.Y.S.2d 219 (1991) ("incumbent on the plaintiffs . . . to lay bare their proof as to the [landlord's] actual or constructive notice of the [lead paint]"); *Winston Properties* v. *Sanders*, 57 Ohio App. 3d 28, 29–30, 565 N.E.2d 1280 (1989) ("must be shown that [landlord] had notice of the defective condition of the premises or that [tenant] attempted to notify appellee of the existence of lead-based paint").

The plaintiffs do not dispute this analysis. Instead, they contend that § 47a-8 creates a standard the violation of which constitutes negligence per se. Moreover, they contend that, because this statutory provision does not provide for any excuses, landlords are strictly liable for any violations of that provision. Thus, we must next examine the doctrine of negligence per se and that doctrine's connection to traditional principles of landlord premises liability.

## B

Although the common law imposes on landlords only a duty to maintain in a reasonably safe condition those areas of their premises over which they exercise control, statutes may impose on landlords additional duties or obligations. See *Panaroni* v. *Johnson*, 158 Conn. 92, 102, 256 A.2d 246 (1969) (New Haven housing code obligated landlord to maintain outside stairway in sound condition or good repair); *Chambers* v. *Lowe*, 117 Conn. 624, 628–29, 169 A. 912 (1933) (legislature may change common law rules of landlord liability to impose new obligations on landlords). Indeed, under general principles of tort law, a requirement imposed by statute may establish the applicable standard of care to be applied in a particular action. It is well established that "[i]n order to establish liability as a result of a statutory violation, a plaintiff must satisfy two conditions. 'First, the plaintiff must be within the class of persons protected by the statute. [*Coughlin* v. *Peters*,

153 Conn. 99, 101, 214 A.2d 127 (1965)]; *Hassett* v. *Palmer*, 126 Conn. 468, 473, 12 A.2d 646 [1940]; *Monroe* v. *Hartford Street Ry. Co.*, 76 Conn. 201, 207, 56 A. 498 [1903]. Second, the injury must be of the type which the statute was intended to prevent. *Toomey* v. *Danaher*, 161 Conn. 204, 212, 286 A.2d 293 [1971]; *Longstean* v. *McCaffrey's Sons*, 95 Conn. 486, 493, 111 A. 788 [1920]. See Prosser, Torts (4th Ed.) § 36; Restatement (Second), 2 Torts §§ 286, 288 [1965].' *Wright* v. *Brown*, 167 Conn. 464, 468–69, 356 A.2d 176 (1975)." *Berchtold* v. *Maggi*, 191 Conn. 266, 274–75, 464 A.2d 1 (1983).[15]

"Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. They merely decide whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law. See Prosser, [supra] § 36." *Wendland* v. *Ridgefield Construction Services, Inc.*, 184 Conn. 173, 178, 439 A.2d 954 (1981).

In cases involving the doctrine of negligence per se, however, the defendant ordinarily may avoid liability upon proof of a valid excuse or justification. 2 Restatement (Second), Torts § 288A (1965);[16] see also

---

[15] Of course, "the violation of the statute, although negligence per se, had to be proven to be a substantial factor in causing the plaintiff's damages before [the plaintiff] could recover. . . . This requirement applies to negligence which results from the violation of the common-law rule as well as a statute." (Citations omitted.) *Busko* v. *DeFilippo*, 162 Conn. 462, 466, 294 A.2d 510 (1972).

[16] Section 288A of the Restatement (Second) of Torts (1965) provides:
"Excused Violations

"(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.

"(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when

*Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 150, 491 A.2d 389 (1985). In particular, even if a defendant has contravened a statute the violation of which constitutes negligence per se, that defendant usually may avoid liability by showing that "he neither knows nor should know of the occasion for compliance." 2 Restatement (Second), Torts § 288A. The commentary to the Restatement explains that "[w]here the actor neither knows nor should know of any occasion or necessity for action in compliance with the legislation or regulation, his violation of it will ordinarily be excused." Id., comment (f). The Restatement provides the following example: "A statute provides that no vehicle shall be driven on the public highway at night without front and rear lights. While A is driving on the highway at night his rear light goes out because of the failure of an electric bulb. A has used all reasonable diligence and care in the inspection of his car, and is unaware that the light has gone out. Before he has had any reasonable opportunity to discover it, the absence of the light causes a collision with B's car, approaching from the rear, in which B is injured. A is not liable to B on the basis of the violation of the statute." Id., illustration (3).

On the other hand, some statutes that create a standard of care the violation of which constitutes negligence per se do not permit a defendant to avoid liability on the basis of an excuse. "Such statutes in reality result in strict liability, although the courts have continued to speak of liability for negligence. When they are adopted by the court as defining a standard of conduct for a tort action, the standard adopted is one of strict liability,

---

"(a) the violation is reasonable because of the actor's incapacity;

"(b) he neither knows nor should know of the occasion for compliance;

"(c) he is unable after reasonable diligence or care to comply;

"(d) he is confronted by an emergency not due to his own misconduct;

"(e) compliance would involve a greater risk of harm to the actor or to others."

and the statute is still construed to permit no excuse." Id., comment (c). Nonetheless, "[m]ost legislative enactments . . . receive no such strict construction." Id., comment (d).

Before applying these principles to the present situation, we first acknowledge that this court has not often construed a statutory provision in the landlord-tenant context as creating a standard the violation of which constitutes negligence per se. The majority of cases concluding that a statutory provision implicates the doctrine of negligence per se have arisen in the context of motor vehicle regulation. See, e.g., *Velardi* v. *Selwitz*, 165 Conn. 635, 639, 345 A.2d 527 (1974); *Busko* v. *DeFilippo*, 162 Conn. 462, 466, 294 A.2d 510 (1972); *Bailey* v. *Bruneau's Truck Service, Inc.*, 149 Conn. 46, 54, 175 A.2d 372 (1961). Such a history, however, should not be read to suggest that the negligence per se doctrine is relevant only in the context of statutes pertaining to motor vehicles. Indeed, in *Panaroni* v. *Johnson*, supra, 158 Conn. 100–102, we concluded that the trial court had not improperly charged the jury that certain provisions of the New Haven housing code imposed an affirmative duty on the landlord, beyond the requirements of the common law, the violation of which gave rise to civil liability. Although the defective part of the premises at issue in the case was an outside stairway leading to the tenant's apartment, this court approved a charge that had authorized the jury to consider whether the landlord had breached a common law duty to repair an area under his dominion and control or, in the event that the jury concluded that the stairway had not been under the landlord's control, whether the landlord had breached a duty created under the provisions of the housing code.[17]

---

[17] The court in *Panaroni* charged the jury in relevant part as follows:

"200. If you do not find control in the landlord of the rear stairway and if you do not find that the landlord had actual notice of the dangerous conditions which caused the plaintiff to fall you will next consider the applicability of the Housing Code of the City of New Haven.

In doing so, the *Panaroni* court reasoned that "[t]he violation of an ordinance enacted for the protection of the public is negligence as a matter of law. . . . From a review of the housing code in its entirety, it is apparent that the plaintiff is a member of the class for whose protection the housing code was enacted. . . . This is evident from the design of the code as enacted and particularly from a review of the preamble wherein it is stated, inter alia, that it establishes minimum standards governing the condition and maintenance of dwellings and conditions essential to make dwellings safe and fit

"201. Paragraph 302 of this code read as follows: No person shall occupy as owner-occupant or let to another for occupancy any dwelling or dwelling unit for the purpose of living therein which does not comply with the following requirements, and then there are two sections which are pertinent to this case. One is subsection c which reads as follows: Stairs, porches. Every inside and outside stair, every porch, and every appurtenance thereto shall be maintained and kept in sound condition and good repair. Subparagraph g: Exterior wood surfaces. All exterior wood surfaces shall be adequately protected from water seepage and against decay.

"202. These code provisions impose an affirmative duty on landlords with respect to the items mentioned whether or not they are in control. The landlord has a duty to make reasonable inspection to determine the need for repairs and he also has the affirmative duty to exercise reasonable care to make such repairs as are reasonably necessary. If a tenant is injured as a result of a violation by the landlord of these provisions, then the landlord is responsible. Thus under this heading if the landlord knew of the dangerous condition or if he should have known—in other words, if he could have discovered the dangerous condition as a result of making reasonable inspections, then he is responsible for all injuries and losses proximately resulting from such negligence.

"203. When a tenant takes exclusive possession of demised premises she ordinarily takes them as she finds them and the landlord is not liable for structural defects therein except those which the tenant could not discern with reasonable diligence and with knowledge of which the landlord was chargeable. However, the landlord is not relieved of liability for structural defects which exist in those portions of the premises under his control irrespective of when they originated. Nor is he relieved of liability where he has agreed to make repairs by virtue of a lease nor where he has a duty to make repairs by virtue of a state law or local ordinance. Consequently, in this case, if you find that the plaintiff fell as a result of a defective stair it is immaterial whether the dangerous condition existed at the inception of the lease or whether it arose thereafter." *Panaroni* v. *Johnson*, Conn. Supreme Court Records & Briefs, February Term, 1969, Record, p. 298.

for human habitation; that it fixes certain responsibilities and duties of owners and occupants because there is or may be dilapidated, unsafe, and dangerous structures, among others, constituting a menace to the health and safety of the people of the city; and that a housing code is essential to establish these responsibilities and to set minimum standards sufficient to protect public health and safety. The owner, under the code, either as occupant or landlord has the obligation to maintain and keep every outside stair in sound condition or good repair. New Haven Housing Code, ¶ 302 (c) (1954, as amended). The violation of a city ordinance which provides for a criminal penalty may be found to be the proximate cause of an injury which will support recovery in an action in negligence." (Citations omitted.) Id., 101–102. Thus, *Panaroni* makes clear that a statutory provision may impose on landlords additional duties the violation of which constitutes negligence per se.

In the specific circumstances of a case such as this, in which the plaintiffs claim that the landlord's violation of § 47a-8 caused damages resulting from their minor son's ingestion of lead-based paint in the apartment, we believe that the policies underlying the negligence per se doctrine apply and, therefore, we agree with the Appellate Court's conclusion that § 47a-8 imposes on landlords a standard of care the violation of which constitutes negligence per se. In deciding whether the legislature intended to provide for such statutory liability, we look to the language of the statute and to the legislative history and purposes underlying the provision's enactment. See, e.g., *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 318–19, 659 A.2d 1166 (1995); *Federal Deposit Ins. Corp.* v. *Hillcrest Associates*, 233 Conn. 153, 163, 659 A.2d 138 (1995); *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991). In determining whether a particular statutory provision imposes on landlords a duty such that a violation of

that provision supports an action in negligence, we review the statutory scheme in its entirety, including the design of the scheme as enacted. See *Panaroni* v. *Johnson,* supra, 158 Conn. 101.

The language of § 47a-8 provides: "The presence of paint which does not conform to federal [lead paint] standards . . . or of cracked, chipped, blistered, flaking, loose or peeling paint which constitutes a health hazard on accessible surfaces in any dwelling unit, tenement or any real property intended for human habitation shall be construed to render such dwelling unit, tenement or real property unfit for human habitation and shall constitute a noncompliance with subdivision (2) of subsection (a) of section 47a-7." This language makes clear that the legislature intended to make a per se violation of § 47a-7 the presence of paint in violation of either the federal lead-based paint standards or the health hazard standards of § 47a-54f (b). The legislature's adoption of these specific hazards as per se violations of § 47a-7 suggests that the legislature considered the various risks and benefits associated with the continued use of lead-based paints and meant to hold landlords to a particular standard of conduct.

The purposes underlying the adoption of these per se violations are reflected in the provision's legislative history. Indeed, the Appellate Court aptly noted that "the legislative history reflects that a clear purpose of the act was to end the health problems arising specifically from the presence of lead-based paint. 14 H.R. Proc., Pt. 4, 1971 Sess., pp. 1766–69; 14 S. Proc., Pt. 4, 1971 Sess., p. 1533." *Gore* v. *People's Savings Bank,* supra, 35 Conn. App. 134. Children are those most likely to incur health problems as a result of exposure to lead-based paints. Consequently, we believe that the legislature intended to include children such as Kendall Copeland within the class of plaintiffs protected by the statute and that it intended to protect such plaintiffs

from the hazards of lead poisoning. As a result, we agree with the Appellate Court that a violation of § 47a-8 constitutes negligence per se for the purposes of the plaintiffs' action.[18]

We disagree, however, with the Appellate Court's further conclusion that the legislature intended not to permit excuses or justifications for such a per se violation. More specifically, we disagree that a landlord's lack of notice is not related to a cause of action based on § 47a-8. Moreover, we believe that the Appellate Court misconstrued the relationship between common law premises liability and the doctrine of negligence per se in resolving the question of the availability of excuses in this case. The Appellate Court, after first concluding that the defendants' violation of § 47a-8 constituted negligence per se for the purposes of the plaintiffs' action, determined that it provided for strict liability because the statutory provision was "lacking any provision for an excuse for the violation . . . ." *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 136. This analysis presumes that, if a statute is construed as providing for negligence per se, then that statute should be further construed as providing for no excuses *unless* the statute itself expressly provides for such excuses. The Appellate Court cited no authority for such a presumption in this context. A court's interpretation that a statute provides for negligence per se ordinarily does not lead to the further conclusion that the statute prohibits excuses. See 2 Restatement (Second), Torts § 288A, comment (d). Indeed, "[n]o statute is to be construed as altering the common law, farther than its words import [and a statute] is not to be construed as making any innovation upon the common law which it does not fairly express." (Internal quotation

---

[18] In this case, we have no occasion to consider and therefore do not determine whether other provisions of title 47a of the General Statutes may implicate the negligence per se doctrine.

marks omitted.) *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 172, 530 A.2d 596 (1987); *State* v. *Sanchez*, 204 Conn. 472, 479, 528 A.2d 373 (1987); *Dennis* v. *Shaw*, 137 Conn. 450, 452, 78 A.2d 691 (1951); 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1986 Rev.) § 50.05. Thus, the Appellate Court should have reasoned that notice was relevant to the plaintiffs' action unless the legislature had expressly removed notice considerations from the action.

Examining § 47a-8 under this framework, we are unpersuaded that the legislature intended to create a standard the violation of which establishes a landlord's strict liability for injuries sustained by a minor plaintiff due to exposure to lead-based paint. Although the plaintiffs point to the language of §§ 47a-7 and 47a-8 and their legislative histories as indicating a legislative intent to provide strict liability, we can discern no such legislative intent. We agree that the language and histories of these sections indicate the legislature's intent to prohibit the use of lead-based paints and to prevent the existence of chipped or otherwise dilapidated paint for the protection of children, but the plaintiffs have shown us nothing to indicate that the legislature intended the extraordinary result of holding a landlord liable for injuries sustained by a minor due to exposure to lead-based paint regardless of a valid excuse or justification, such as lack of notice, for the violation. Absent such an indication, we do not "add" a notice requirement in declining to recognize strict liability; rather, we merely recognize that the legislature has not acted to eliminate the common law requirement of notice.

Our approach is supported by the position of the Restatement (Second) of Property. "A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken

possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of: (1) an implied warranty of habitability; or (2) a duty created by statute or administrative regulation." 2 Restatement (Second), Property, Landlord and Tenant § 17.6 (1977). The commentary clarifies the rationale underlying § 17.6: "Insofar as a duty created by a statute or administrative regulation is concerned, the rule of this section is *based on the assumption that the statute or regulation represents a legislative determination of the standard of conduct required of the landlord, so that the violation constitutes negligence per se* (as to which see §§ 286–288C of the Restatement of the Law, Second, Torts). The tort liability of the landlord in this situation tends to increase the likelihood that the will of the legislature as expressed in the statute or regulation will be effectuated. . . .

"An overriding requirement of the rule of this section is that there be a dangerous condition on the leased property, the existence of which is in violation of either an implied warranty of habitability or a duty created by statute or administrative regulation." (Emphasis added.) Id., comment (a).

The commentary to § 17.6 further explains the "reasonable care" aspect of the rule, stating that "[t]he landlord is subject to liability under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care. Ordinarily, the landlord will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession. Where the condition arises after the tenant takes possession, the landlord may not be able, in the exercise of reasonable care, to discover the condition, in which case the landlord will not be liable under the rules of this section until he has had a reasonable opportunity to remedy the condition after

the tenant notifies him of it. Where the landlord is able to discover the condition by the exercise of reasonable care, he is subject to liability after he has had a reasonable opportunity to discover the condition and to remedy it." Id., comment (c). Thus, the Restatement (Second) of Property states that, even if the landlord violates a standard the violation of which constitutes negligence per se, no liability ordinarily attaches for injuries stemming from the violation unless the landlord had actual or constructive notice prior to the violation.

In *Richwind* v. *Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), the Court of Appeals of Maryland addressed a question quite similar to the one in this case and adopted the approach of § 17.6 of the Restatement (Second) of Property. The relevant facts of *Richwind* are as follows. In late 1983, Barbara Richardson moved into a residential rental property in the city of Baltimore. After moving into that property, she gave birth to a child in 1984 and another child in 1985. In early 1986, the owner of the property, Richwind Joint Venture (Richwind), hired Scoken Management Corporation (Scoken), to assume the management of the property. At that time, the president of Scoken knew that buildings such as Richwind's often contained lead-based paints, but he had no specific knowledge about the presence of lead in Richwind's property or in Richardson's particular unit. Soon after Scoken assumed the management of the property, Richardson forwarded to Scoken a series of complaints about the disrepair of her apartment, including the complaint "[p]aint and plaster peeling from walls." *Richwind* v. *Brunson*, supra, 668. The president of Scoken responded to these complaints by dispatching workers to correct the problems, but he did not inspect the work himself to determine whether the repairs had been made adequately.

On September 3, 1986, Richardson's two children were diagnosed with elevated blood-lead levels and

thereafter received considerable medical treatment. As a result, the Baltimore city health department inspected the property and served Richwind and Scoken with a notice listing forty-two lead-based paint violations and requiring the removal of the lead hazards. Id., 668–69. Richardson subsequently sought to recover for, inter alia, negligence on behalf of her children against Richwind, Scoken and the original owners of the property. The jury found in favor of the plaintiffs on the negligence count, and the verdict was affirmed by the Court of Special Appeals. Id., 669.

In affirming the jury's verdict in favor of the plaintiffs on the negligence count, the *Richwind* court first stated that, pursuant to § 17.6 of the Restatement (Second) of Property, "a private cause of action in a landlord/tenant context can arise from a violation of any statutory duty or implied warranty created by the Baltimore City Code." Id., 671–72. The court recognized that the following provisions in the Baltimore city code were directly implicated by the plaintiffs' action for the injuries caused by the lead-based paint: (1) § 702, which "provides that every building in Baltimore City which is occupied as a dwelling is to be 'kept in good repair, in safe condition, and fit for human habitation' "; (2) § 703 (2) (c), which "defines one of the standards for good repair as . . . '[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint and paper' "; and (3) § 706, which provides that " '[n]o paint shall be used for interior painting of any dwelling . . . unless the paint is free from any lead pigment.' " The court further stated that "[t]he implied warranty of habitability established by §§ 702 and 703 necessarily includes flaking, loose or peeling lead-based paint within the scope of hazardous conditions that render the premises unfit for human habitation. Thus, a landlord leasing property in Baltimore City is under a statutory obligation to correct

such a hazardous condition even in the absence of a contractual duty to do so." Id., 670–71.

The *Richwind* court then concluded that, because the city code included a provision requiring the housing commissioner to give notice to a landlord for any violation[19] and because the common law had a notice requirement, notice was a part of the plaintiffs' cause of action. Id., 674. Accordingly, the court held that "the city code does not alter or supersede the common law concerning a landlord's knowledge of a defective condition on the premises." Id., 676; see also *George Washington University* v. *Weintraub*, 458 A.2d 43, 47–48 (D.C. 1983) ("Housing Regulations do not impose immediate and unconditional liability upon a landlord for code violations but, instead, contemplate sanctions only if repairs are not effected after actual or constructive notice of the defect reaches the landlord"); *Winston Properties* v. *Sanders*, supra, 57 Ohio App. 3d 29–30 ("[a]ssuming, arguendo, that [the landlord] was negligent per se in violating the ordinance [that regulates the use of lead-based paint], it still must be shown that [the landlord] had notice" of the lead-based paint or that the tenant attempted to notify the landlord).[20] The *Richwind* court

[19] Section 301 of the Baltimore city code provided: "Whenever the Commissioner of Housing and Community Development determines that there has been a violation of any provision of this Code or of any rule or regulation adopted pursuant hereto, he shall give notice of such alleged violation to the person or persons responsible therefor as hereinafter provided." See *Richwind* v. *Brunson*, supra, 335 Md. 673.

[20] The plaintiffs, following the rationale adopted by the Appellate Court, would have us distinguish these cases on the basis of the differences in the statutes and ordinances that were at issue in them. The Appellate Court distinguished this case, involving a violation of § 47a-8, from other cases predicating a landlord's liability for a defect in the premises on the landlord's receipt of notice on the basis that the other cases "did not involve the violation of a statute specific to the defect alleged, but rather, were clearly predicated upon common law negligence principles." *Gore* v *People's Savings Bank*, supra, 35 Conn. App. 134. We agree that § 47a-8 fixes, for the purposes of showing a violation of § 47a-7, a specific standard regarding the use of lead-based paints and the condition of paint in dwellings. As a result, we agree, on the basis of the legislature's adoption of this specific standard, that a

affirmed the jury's verdict in favor of the plaintiffs because there was sufficient evidence from which the jury could have concluded that Scoken had received either actual or constructive notice of the lead violation and that Scoken had failed to remedy the violations within a reasonable period of time. *Richwind* v. *Brunson*, supra, 335 Md. 678–81.

As in *Richwind*, the common law in Connecticut has always included a notice requirement as part of a tenant's cause of action. Furthermore, as in *Richwind*, the statutory scheme at issue in this case does not eliminate that requirement. Indeed, the statutory framework evinces a legislative intent to afford landlords the opportunity to remedy violations of housing standards after receipt of notice. General Statutes § 47a-58 (a) provides, inter alia, that "[a]ny enforcing agency may issue a notice of violation to any person who violates any provision of this chapter or a provision of a local housing code. Such notice shall specify each violation and specify the last day by which such violation shall be corrected. . . . The enforcing agency may postpone the last day by which a violation shall be corrected upon a showing by the owner or other responsible person that he has begun to correct the violation but that full correction of the violation cannot be completed within the time provided because of technical difficulties, inability to obtain necessary materials or labor or inability to gain access to the dwelling unit wherein the violation exists." We agree with the defendants that this provision evinces a legislative intent to create a system based on notice rather than strict liability.[21] Moreover,

violation of § 47a-8 constitutes negligence per se. We are unpersuaded, however, that the adoption of this "statute specific to the defect alleged"; id.; evinces the further legislative intent to hold a landlord liable regardless of that landlord's lack of actual or constructive notice.

[21] We are not unmindful that other courts have considered this issue and reached different conclusions. See *Torres* v. *Melody*, Superior Court, judicial district of Norwich, Docket No. CV 910098765 (February 13, 1992, 6 Conn. L. Rptr. 30) (§§ 47a-7 and 47a-8 provide for a claim for negligence as a matter

we agree with the defendants that the legislature knows how to create strict liability when it chooses to do so; see, e.g., General Statutes § 22-357 (providing that dog owners "shall be liable" for damage to any person's body or property caused by dog); and that there is nothing to indicate that it chose to do so in this case.[22]

of law); *Hardy* v. *Griffin*, supra, 41 Conn. Sup. 286 (stating that §§ 47a-7 and 47a-8 provide for strict liability). In these cases, however, the courts applied only half of the analysis. Instead of determining whether the provisions created a standard the violation of which constitutes negligence per se and *then* further determining whether the provisions eliminated excuses or justifications such as lack of notice, these courts first found that the violations constitute negligence per se and never further examined whether the sections precluded excuses and justifications. As we have stated previously, we agree that a violation of § 47a-8 constitutes negligence per se, but we disagree that the section precludes the excuse of lack of notice.

Moreover, we disagree with the plaintiffs that their position is supported by the decision of the Appellate Court in *Housing Authority* v. *Olesen*, supra, 31 Conn. App. 359. Although the Appellate Court in that decision "decline[d] to impose a notice provision"; id., 364; it did so only in the specific context of General Statutes § 47a-4a, which provides that "[a] rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection (a) of section 47a-7." Thus, even if we were to agree with the Appellate Court's conclusion in *Olesen*, that decision has no bearing on whether the legislature intended to remove notice in the context of a tenant's action for compensatory damages.

[22] Because the provisions at issue here do not expressly provide for strict liability, this case is clearly distinguishable from the system of liability in Massachusetts. In *Bencosme* v. *Kokoras*, 400 Mass. 40, 43, 507 N.E.2d 748 (1987), the Massachusetts Supreme Judicial Court concluded that landlords were strictly liable for compensatory damages resulting from violations of the lead-based paint laws. In doing so, however, the court noted that the language of Massachusetts General Laws c. 111, § 199, which created landlord liability, "virtually compel[led] the conclusion that neither negligence nor knowledge of the risk is an element of liability . . . . An owner 'shall be liable for all damages caused by his failure to perform the duties required of him pursuant to . . . [§ 197].' G.L. c. 111, § 199. Section 197 imposes a duty to remove or cover lead paint, plaster, and other material when a child under six years of age resides in the premises. See *Commonwealth* v. *Racine*, 372 Mass. 631, 637 [363 N.E.2d 500] (1977). Neither section imposes that duty only if the owner knew or should have known of the risk or only if the premises had been inspected and a compliance order had been issued. . . . The implication is clear that liability for compensatory damages under the first paragraph of § 199 does not require such a notice. We think it follows that the first paragraph of § 199 was not intended to require proof of negligence and that it should be read and applied literally. There is nothing in

We acknowledge the weighty public policy arguments that may be advanced both in favor of and in opposition to holding landlords strictly liable for injuries sustained by children due to the presence of lead-based paint in their homes. Many of these arguments were raised by the parties and in the various briefs of the amici curiae.[23] For example, some suggest that holding landlords strictly liable would best motivate them to eliminate the presence of lead-based paint in their rental properties and, therefore, would most effectively protect children from the often tragic consequences of lead ingestion.[24] Moreover, the Appellate Court reasoned that the notice requirement "would not fulfill the pur-

the legislative history . . . that indicates that the literal reading we give to §§ 197 and 199 was not intended." *Bencosme* v. *Kokoras*, supra, 43–44. The statutory scheme at issue in this case does not include such clear and unmistakable language. Thus, the existence of such liability in Massachusetts sheds little light on the question before us.

[23] Amicus briefs were filed by the Connecticut Business and Industry Association, the American Insurance Association, the Connecticut Defense Lawyers Association, and the Connecticut Trial Lawyers Association.

[24] The Connecticut Trial Lawyers Association, in its brief, points us to the 1990 estimate of the Connecticut department of health services that more than 6000 children in the state have elevated lead levels. "The effects of high lead levels in children include decreased intelligence, slowed development, behavioral disturbances, impaired hearing, kidney ailments, changes in vitamin D Metabolism and disturbance of blood production including anemia. Most of these effects persist long after exposure has ended, perhaps for the lifetime of the affected child. Children who suffer lead related impairment will, throughout their lives, contribute less to themselves and to society." State of Connecticut, Department of Health Services, Lead Poisoning Fact Sheet (1990).

"High blood levels of lead cause various adverse effects. Severe lead exposure . . . can cause coma, convulsions, and death. Moderate levels . . . can adversely affect the central nervous system, kidneys, and hematopoietic system. Low levels . . . can lower intelligence and impair neurobehavioral development. . . . The federal government estimates that at least three million children in the United States (approximately seventeen percent) are at risk from lead poisoning. A disproportionately high number of ethnic minority children live in poverty, in dilapidated housing, and are poisoned by lead paint. The government's neglect of this problem raises the issue of environmental racial inequity." J. Schukoske, "The Evolving Paradigm of Laws on Lead-Based Paint: From Code Violation to Environmental Hazard," 45 S.C.L. Rev. 511, 516–17 (1994).

pose of the statutes, namely, to curb the evils resulting from lead-based paint. In many cases, a landlord would not be notified of the danger until a child has already ingested the paint, become ill, and undergone medical tests, the results of which indicate an abnormal presence of lead in the body. There is no indication that the legislature intended that §§ 47a-8 and 47a-54f (b) be construed in a manner that would allow the potential harms caused by the presence of lead-based paint to proliferate." *Gore* v. *People's Savings Bank*, supra, 35 Conn. App. 135. On the other hand, the defendants have suggested that a system of strict liability would motivate landlords, in fear of the substantial costs of lead abatement and limitless liability, to abandon their properties, which would stifle abatement and further cause children to be exposed to lead-based paint. See generally M. Gilligan & D. Ford, "Investor Response to Lead-Based Paint Abatement Laws: Legal and Economic Considerations," 12 Colum. J. Envtl. L. 243, 278–82 (1987) (discussing relationship between potential liability of landlords for injuries caused by lead-based paint and an investor's decision to invest or disinvest in urban rental housing).

These scenarios are plausible consequences of a system of strict liability. We are in no position, however, to weigh these economic and social arguments; it is the role of the legislature to consider these alternatives and enact legislation it deems appropriate. In the absence of a clear indication of legislative intent, it would be speculative for us to assume that the legislature intended to follow any of these particular policies. See *White* v. *Burns*, 213 Conn. 307, 328–30, 567 A.2d 1195 (1990).

## II

We next address the effect of No. 94-220, § 11, of the 1994 Public Acts (P.A. 94-220), which repealed § 47a-8.

This requires little discussion. The defendants do not claim that P.A. 94-220 can be applied retroactively to eliminate the plaintiffs' cause of action. Rather, they claim that the legislature's repeal of § 47a-8, in response to the *Hardy* and *Olesen* decisions, clarifies that the legislature had never intended § 47a-8 to be construed as creating strict liability. Furthermore, the defendants cite to numerous passages in the legislative history of P.A. 94-220 that, in their view, show that our legislators had never intended to impose on landlords the harsh effects of strict liability.[25] The plaintiffs, on the other hand, contend that the legislature had originally intended to create strict liability pursuant to § 47a-8 and

---

[25] For example, the defendants cite to the statement of Representative Patricia Dillon, who stated that "[t]he reality is, that a number of years ago, we created a lead paint task force and one of the reasons that I did that was that a property owner in New Haven had a $1 million judgment against him. A person who I believe, in all innocence, purchased a property and happened to be the person at the end of a long chain of liability. It was unanticipated.

"It became very clear to us that we have a serious problem, not only with our children, but that our property owners were at risk, our housing stock was at risk and over time, as some of the banks started raising questions about the condition of our housing, the potential for not being able to write loans in New Haven became apparent as well.

\* \* \*

"Again, these are property owners who I believe have not done anything wrong . . . .

"What we are trying to do is to try to craft a remedy to a problem that is being driven by case law, by existing regulations which are placing our housing stock at risk, our property owners at risk, our children at risk." 37 H.R. Proc., Pt. 16, 1994 Sess., pp. 5722–24.

The defendants also cite to the statement of Representative Daniel F. Caruso, who stated that "when we're talking about an issue such as lead and affordable housing, and we're talking about a statute which says, Mr. Landlord, you're out there renting property to someone and if there is any lead paint, we're not going to let you collect your rent and therefore, you can't pay your mortgage and maybe you can't send your kids to school and all those other things.

"What we're doing is telling the landlords, hey, sell that property, rock bottom prices, whatever you can get, get out of the rental market, because it's not worth it. Why would anyone in the world rent a place for which they couldn't get rent? I mean what we're talking about is being a little reasonable here. And there's a case which says, it's right on point, that says, Mr. Landlord, you can't collect that rent." Id., pp. 5755–56.

that the repeal in 1994 cannot be applied retroactively to foreclose their preexisting strict liability action.

We agree with the parties that the legislative history suggests that the legislature repealed § 47a-8 in response to the *Hardy* and *Olesen* decisions. See footnote 21. The legislative history is unclear, however, about whether this response was intended to clarify that the legislature had never intended to create strict liability or whether, in the alternative, the repeal was meant to eliminate strict liability that the legislature had intended to create pursuant § 47a-8. Thus, we conclude that the enactment of P.A. 94-220, § 11, has no effect on the liability of the defendants in this case.

The judgment of the Appellate Court is reversed and the case is remanded to that court for consideration of the plaintiffs' other claims.

In this opinion the other justices concurred.