[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action sounding in negligence brought on behalf of Steven Pattavina, who was born on January 28, 1962, and who has suffered throughout his life from severe mental retardation, by his natural CT Page 9685 parents and plenary guardians, Emanuel Pattavina and Connie Pattavina, and by his parents in their own right claiming to have suffered emotional distress as a result of tortious actions of the Commissioner and/or his agents, servants or employees. The defendants herein are William J. Mills and Dale G. Swett, long time employees of the Department of Mental Retardation (hereinafter referred to as "DMR") and the defendant, the Commissioner of the Department of Mental Retardation (hereinafter referred to as "Commissioner").
Based upon the relevant, admissible and credible evidence presented to the court during the course of this lengthy trial and all relevant inferences therefrom, the following constitute the findings of fact and conclusions of law with respect to this litigation.
As aforesaid, Steven Pattavina was born on January 28, 1962, and accordingly as of this date is a little older than 38 years of age. He is profoundly retarded. His deficiencies were discovered when he was approximately 3 years old, and on or about September 15, 1965, his parents requested the State of Connecticut take charge and placed him with the DMR for care and treatment of his mental condition. The DMR has had the care, custody I and control and responsibility for Steven Pattavina since that time, up to and including the time of trial.
The DMR operated a facility known as Mansfield State Training School until the early 1990's, at which facility Steven has been cared for for a considerable period of time and he was transferred and placed in another DMR facility known as Cuprak Road Group Home (hereinafter referred to as "Cuprak") on or about December 1, 1993. Up to the initiation of this lawsuit, Steven remained at Cuprak where the DMR provided him with a place to reside, as well as, care and treatment of his mental condition.
At all times relevant to this lawsuit, the defendant, William J. Mills, was an employee, servant and/or agent of the DMR assigned by the DMR to work at Cuprak as a supervising mental retardation worker. The defendant, William J. Mills (hereinafter referred to as "Mills"), was responsible for providing care and treatment to Steven and for supervising other DMR employees at Cuprak which were also providing care and treatment to Steven.
At all times relevant to this lawsuit, the defendant, Dale G. Swett, was an employee, servant, and/or agent of the DMR assigned by the DMR to provide care and treatment to the plaintiff at said Cuprak facility.
Over the years, the plaintiff-parents monitored their son's care and treatment throughout his placement with the DMR. When Steven was three years of age, they decided that they could not adequately provide care, CT Page 9686 custody and control of him due to his profound retardation. For his entire life, Steven has been nonverbal. He is unable to talk or to convey his thoughts to anyone. He does make sounds, some of which seem to elicit fear, and some of which appear to elicit a happier mood. Over the years, his parents have remained quite involved in monitoring their son's care and treatment. While they did not personally attend all quarterly meetings regarding Steven and/or his treatment plan, they received and reviewed documentation produced by the DMR as a result of these meetings. There is no question but that the parents put their faith and trust in the DMR to provide their son with appropriate care and treatment. They looked to the DMR to provide Steven with the best quality of life possible for a profoundly retarded individual. For 35 years, they have remained the plenary and legal guardians of their son and have made the required financial contributions toward his care and treatment. The parents have regularly visited Steven at the various hospital and homes where he has lived. As a result of the documented abuse of Steven, and the manner in which it was discovered by Mr. Pattavina, the parents have suffered extreme mental and emotional distress. They have each received medical treatment from Dr. Brendon Mantano in connection with their emotional distress.
Steven, while he cannot orally communicate, does elicit the aforementioned sounds which propose to show moods of happiness or sadness or fear. He is very prone to bolt from one place to another, and therefore, for years has been cared for on what is commonly termed a one-to-one "close" supervision. This means a worker-caretaker should never be more than 6 feet distant from him while he is awake. His lifetime habits have indicated that he is most likely to bolt or to run if he sees coffee and perhaps some other liquids.
Steven has long shown himself to be a very self-injurious person. He tends to hurt or mutilate himself if not watched closely. He scratches or cuts himself easily. He is physically an imposing person at this stage in his life. He is difficult to manage and this court concludes from overall testimony presented that he is perhaps one of the most challenging patients that the Commissioner has under the DMR care. He requires constant, vigilant and careful watching.
Because of his inclination to disturb others and things about him, Steven would easily antagonize his caretakers and co-patients. He did things like break dishes or bowls and unravel whole rolls of toilet paper at the Cuprak facility. These propensities of Steven were well-known to his caretakers over a long period of time, and along with his inability to speak and make known verbally his feelings, fears and his problems with living, he was recognized and labeled as high-risk by his advocate, Ms. Gilmartin, and his review team, which monitors and reviews his CT Page 9687 treatment plan. The team is made up of family, the DMR staff and professionals to serve the individual patients, recommend optimal treatment plans and serve to avoid harmful situations for the patients. These questions of Steven and his needs and level of care were known to all department personnel charged with his care for a long period of time prior to June, 1995. When he was taken to a location other than his residence, there was always a driver and at least one other worker with him.
Steven had been at Seaside, Mansfield State Training School and group homes and finally was placed at Cuprak in December, 1993. He was removed to another facility in February, 1999. Originally, the Cuprak Group Home was to have been a temporary placement for Steven until some permanent other leased facility could be available. The other facility never materialized. Cuprak was not really an ideal setting for Steven, since a co-patient there and Steven had had a long volatile history when living together and it was not ideal that she remain at Cuprak with him or vice versa. This was also known for a long period of time by worker-caretakers of Steven. The other co-patient tended to excite and antagonize him causing negative behavior by Steven.
In 1993, Steven had been transferred from Mansfield State Training School by virtue of a federal court order. At that time, Ms. Gilmartin was appointed as his advocate. She is not an employee of the DMR but an independent agency whose duties are to monitor, check and question the treatment plan of those assigned to her for surveillance and to be involved in the ongoing meetings and treatment plan planning for these patients. She did, starting in 1993, check on him and attend his team meetings and was aware of his medication schedule, placement treatment plan and overall problems. She noted early on, after 1993, that he was at high risk for mistreatment as a result of his condition. This concern was transmitted to the team and they recognized that he was a patient with high risk potential for mistreatment. His condition, action and reactions, created a very tense caretaking situation that resulted in a high anxiety, tension-filled job for those workers assigned to care for him around the clock. He was hyperactive and hard to manage. Ms. Gilmartin's recommendations to those involved in his care were that he was a troubled patient, and nonverbal, and emotionally vulnerable, at high risk for being harmed, and that he easily frustrated the staff assigned to him. He needed to be treated with "kid gloves." By virtue of his nonverbal condition, she told those with whom she had contact, employees of the DMR, that extra vigilance was required in connection with his care.
The team that monitors Steven's care met monthly and/or quarterly and consisted of family members, and staff professionals who monitored the CT Page 9688 services being provided for Steven by virtue of his treatment plan. They were charged with preventing harmful situations arising in connection with his care.
The ups and downs of his life were daily logged by his workers. Great difficulties attended the care-giving necessary for Steven to minimally function in this group home setting.
The defendant-Mills perpetrated various acts of negligence and abuse upon Steven. He was the supervising MRW 1 (Mental Retardation Worker 1) assigned to Cuprak. He was a supervisor in 1984, and at various times thereafter, including the period of time that Steven was at Cuprak in the 1990's prior to the investigation herein. He had been in charge of Steven's care for a number of years after 1993, up to and including the time he was removed after the investigation of alleged abuse of Steven was initiated in June of 1995. He had been first employed by the DMR in 1978 and reapplied and was rehired. He lied on his employment application in that he stated that he had never been convicted of a crime when, in fact, he had been convicted of Larceny in the Fourth Degree on October 8, 1978. In January of 1985, he had been a subject of a DMR investigation for losing his temper with a 73 year-old patient and stating at that time that, "If you ask me one more time I'll shove it up your ass." This incident he self-reported because there were parents present in the area and had heard him make these remarks. In other incidents he had been investigated for pulling the breasts of a patient and for rudely pushing another patient. These events all occurred well before any problems arose in connection with his care and supervision of Steven Pattavina. In connection with the hiring of the defendant-Mills, and indeed the defendant-Swett hereinafter discussed, the DMR never made any record investigation and had they done so, they would have discovered that each of these defendant-employees had lied on their employment applications in connection with not having previously been convicted of a crime.
In connection with its failure to check the records of these two employees, the court concludes that this was negligence on the part of the DMR along with the failure of the DMR to carefully scrutinize and reassess these two defendants over a number of years as to their willingness and ability to provide appropriate, non-negligent care of those DMR patients who came under their charge.
After Steven came under his care in the years prior to 1995, Mills had lost his temper with Steven on more than one occasion. Mills admitted to another worker that the defendant-Swett represented Mills' "worst nightmare." It is to be noted at this point that the defendant-Mills was the supervisor of the defendant-Swett, although both were from time to time caregivers for Steven Pattavina. Prior to caring for Steven, Mills CT Page 9689 had been seen pulling two chunks of hair out of a patient's head. A formal complaint was filed on February 10, 1995 regarding this matter that occurred at Cuprak and abuse was indicated.
On March 31, 1995, the defendant-Mills applied a "sleeper-hold" to Steven after he had unrolled a roll of toilet paper. A sleeper-hold is when an arm is wrapped around the neck of another person and pressure is applied cutting off the air supply and causing the victim to go faint or collapse into a state of unconsciousness or semiconscious. This is not an appropriate method of controlling the actions of a patient by a caregiver. On another occasion, about this time, Steven's face flushed as Mills approached him and Mills stated, "Why Steven, I have not hit you in 4 weeks-5 counting the week I was on vacation." Although this statement was noted by a co-worker, no reporting action was taken in connection with this matter.
The defendant-Mills resigned on or about the time the formal investigation concerning the abuse of Steven was commenced. The defendant-Swett perpetrated various acts of negligence and abuse upon Steven. He was first employed by the DMR on October 1, 1982. He was at Cuprak from January of 1994 through July of 1995. He had also lied on his employment application in 1982 by stating that he had not been previously convicted of a crime when, in fact, he was convicted of Disorderly Conduct on March 26, 1979, prior to his employment application being filled out. He was a one-on-one caregiver directly involved with Steven's daily care. He appears, and is, very physical in nature, of great stature. On May 22, 1995, he punched a hole in the wall at Cuprak and wrote under it, "This is for you Deb." Relating to a co-worker that had been injured by one of the patients. Earlier than this date, he had told the team concerned with Steven's supervision that Steven responded to fear and intimidation. This remark was noted by the team, and particularly Ms. Gilmartin, and should have alerted these individuals that very close scrutiny should be applied to Swett's caregiving of Steven.
In 1988, the defendant-Swett was reprimanded for pulling a patient out of a medical clinic by the necktie. On March 10, 1993 he was suspended for 5 days for physical confrontation with a co-employee at Seaside. Further, in 1984, he had told a DMR coworker, James Jutras, that he was burned out by the DMR job and related pressures, and admitted kicking a male patient in the stomach.
The defendant-Swett was terminated by the DMR on August 10, 1999 after a formal investigation of these incidents commenced.
Through the witness, Fraser, it was established that the defendants-Swett and Mills had committed acts of abuse against Steven in CT Page 9690 retaliation for Steven hurting Sandy, a co-DMR employee. It was further appropriately established that the defendant-Swett had made false statements to the DMR regarding patients having damaged parts of the group home. From the testimony of a credible co-worker, Bombria, the court concludes that the defendant Swett had threatened to put Steven asleep if he did not behave.
In another event, Swett pushed Steven into a wall in Steven's bedroom causing damage to the wall. He admitted to DMR worker, Fraser, that he and Mills had retaliated against Steven for hurting Sandy, a co-employee, as aforesaid. It is also found that Swett represented an intimidating factor to co-employees, which was one of the reasons that they opted not to report him early on. They were afraid that he would retaliate against them for so doing, and at least one of his co-employees felt that he had damaged her car in retaliation for something she said about him.
As early as 1984, the defendant-Swett had admitted to a supervisor, James Jutras, that he had kicked a mentally retarded patient in the stomach knocking the wind out of the patient. During the trial, he admitted that he was reprimanded by the DMR in 1988 for pulling and leading a mentally retarded person out of the clinic by the necktie as aforementioned. He also admitted to the 5-day suspension for a physical altercation with a co-employee. This latter event occurred approximately 8 months before Swett was placed at Cuprak as a caregiver for Steven.
In connection with the testimony of the defendants-Mills and Swett, this court places very little credibility on their testimony. As related by other co-workers who appear to the court to be credible, they perpetrated various acts of negligent physical contact against Steven, and indeed some acts that are appropriately characterized as being abusive, as hereinafter set forth.
What follows in the court's findings constitutes a litany of negligent and abusive care, and a lack of care given to Steven, principally during the years of 1994 and 1995. The court finds these events to have occurred based upon the testimony of the various co-employees that have testified during the course of the trial. The court finds that they were largely persuasive and credible, particularly in view of the fact that much of the testimony each of them offered could well be contrary to their own best interests. There were admissions, expressed or implied by these witness that they now realize that they failed to act as they should have in reporting abusive treatment of Steven Pattavina, some of which they feel had attributed to their being intimidated by the defendant-Swett principally and/or Mills secondarily. It does not, however, lessen the impact that this failure on the part of several of the DMR employees to CT Page 9691 initiate supervisory scrutiny over Steven's caregivers in 1994 and 1995 constituted acts of negligent omission, and had they acted in accordance of the standards of the DMR, of which they were aware, some or all of the intimidation, injuries and/or abuse inflicted upon Steven would have been avoided.
DMR worker, Fraser, a co-employee of Mills and Swett, was the first person to report the group home abuse to Mark Ballard on June 27, 1995. In less than one day of this report, Mills and Swett were removed from the group home and the investigation into the abuse of Steven was commenced. Prior to that time this witness had seen both Mills and Swett negatively and negligently treat Steven. In December, 1994, Fraser witnessed Steven being taken to his bedroom by Mills and Swett and one Brian Root after he had bolted about the kitchen and moved a dish on the table. Soon thereafter Root returned to the kitchen visibly disturbed by what he saw in Steven's room. Fraser thereafter took Steven out of the group home so she could get him away from Mills and Swett.
In February of 1995, Swett reported that Steven had bruised his face as a result of falling on ice while walking from the van to the group home. This statement was untrue. The bruises had been caused by Swett hurting Steven while he wrestled with him. Fraser had personally accompanied Steven from the van to the home and he did not fall on the ice. Swett was witnessed when he placed Steven in this headlock, sleeper-hold maneuver on March 4, 1995 while in the group home kitchen. When the witness, Fraser, questioned the defendant about his reason for using this hold, he replied, "I put him out before."
On May 13, 1995, Swett related to Fraser that he and Mills had been abusing Steven as retribution against Steven because Steven hurt a co-employee, Sandy Rich. Fraser's credible testimony establishes that Swett admitted to her that he and Mills punched Steven in the groin, hit Steven in the head with a ball-peen hammer and that Swett hung Steven over a stairwell railing by his ankles. Swett also made the remark at this time to Fraser that, "People think we work with cute little Downe Syndromes, and they are not."
Fraser had informed DMR co-worker, Linda Adametz, of this conduct and she had a conversation with Swett concerning his actions toward Steven. Swett later confronted Fraser and claimed that she had betrayed him. Thus, the intimidation continued. At this time, the co-worker, Adametz, also failed to report to the appropriate supervisors the negligent and/or abusive treatment of Steven by her co-workers.
On May 31, 1995 in the evening, Fraser was outside the group home near the window of Steven's bedroom and she was clearly able to see into the CT Page 9692 bedroom. She saw Mills render Steven unconscious by applying a sleeper-hold. Mills then placed his arm around Steven's neck, choked him until his knees buckled and then threw him down on the bed. This was after a toilet paper incident. Fraser was particularly shocked to see this behavior due to the fact that Adametz had previously confronted Mills about his abusive behavior toward Steven. Further, Fraser witnessed the defendant-Swett bend Steven's fingers backwards until Steven would scream with pain.
Subsequently thereafter, Fraser witnessed Swett stand behind Steven, place his arm around Steven's neck and apply pressure until Steven was rendered unconscious and unresponsive. This incident occurred in the living room of the Cuprak Home. Steven became unconscious and Swett allowed him to fall onto the couch. DMR worker, Fraser, was able to revive Steven a short time later. This event occurred before May 13, 1995.
The co-worker, Fraser, admitted that she knew that Mills and Swett were abusing Steven for several months prior to her reporting the abuse to Adametz on May 15, 1995. She attributed her failure to a fear of retaliation by Swett.
While co-worker, Linda Adametz, confronted Mills and Swett concerning the abuse they were perpetrating upon Steven on May 18 and 19, 1995, her efforts were ineffective. Subsequently, Mills was seen choking Steven into a state of unconsciousness on May 31, 1995.
Adametz was negligent in that she failed to report to superiors outside the Cuprak Group Home of the negligent and abusive treatment Steven was receiving from Mills and Swett.
The court is satisfied that these employees, Adametz and Fraser, were made adequately aware of the guidelines of DMR concerning abusive treatment of patients, and even in view of this, failed to take the necessary action to report the abuse to superiors outside the home which would have brought these practices to a halt. It is to be noted that in June, 1995, when Fraser finally called supervisor, Mark Ballard, in less than one day, the supervisory personnel at the DMR suspended the defendants-Swett and Mills, and removed them from the Cuprak home. There were available to these employees supervisory and/or DMR regional mangers to whom reports could have been made, and they failed to so do, which under the circumstances, was negligence on their part.
The group of employees that constituted the team to monitor Steven's treatment plan, was aware and had concern over defendant-Swett's statement to them about a year earlier that the plaintiff responds to CT Page 9693 fear and intimidation. All of the people acting on the team, including Ms. Gilmartin, the advocate, failed to take such action as was appropriate under the circumstances to bring in managing and/or supervisory personnel to give close scrutiny early-on to the care that Steven was receiving. They knew that Steven was a difficult patient to manage and was at high risk because of his inability to orally communicate with anyone. He was vulnerable at best, and his vulnerability was taken advantage of by the defendants Swett and Mills, for a substantial period of time.
Early on after 1993 when she became involved, Ms. Gilmartin further advocated to the team her recommendations that Steven be afforded kind, gentle attention with a degree of firmness. He needed consistent, but not overbearing supervision. The team and the managers failed to follow these recommendations, and as subsequently exhibited, the defendants-Swett and Mills, failed to live up to these reasonably, minimal expectations as I recommended by the advocate, Ms. Gilmartin.
Thus, through the action and/or inaction of the DMR employees, the defendant-Commissioner notice was triggered early-on that Steven Pattavina was not only at high risk for receiving abusive treatment but, in fact, was receiving abusive treatment at the hands of these defendant-employees.
At the trial, the defendant-Swett filed a motion to dismiss Counts Ten, Thirteen, Fourteen, Fifteen, Sixteen and Twenty-Six as alleging negligent conduct against the said defendant-Swett, relying on Conn. Gen. Sec. § 4-165. Said reliance is misplaced. General Statutes § 19a-24 was intended by the legislature to apply to all civil actions against the commissioner . . . or any member of their staffs. By its enactment the legislature has waived the sovereign immunity of the state in those cases in which the statute applies. Duguay v. Hopkins,191 Conn. 222, 232, 464 A.2d 45 (1983). Motion to dismiss is denied.
With respect to Counts One, Two, Three and Four (Mills) and Ten, Eleven, Twelve and Thirteen (Swett), the court finds that the abusive actions of these defendants with respect to the plaintiff, Steven Pattavina, as aforesaid, were wanton and wilful acts on their part.
Accordingly, no responsibility may be imputed to the defendant-Commissioner. General Statutes § 19a-24 et. seq. In addition, the immunity granted by § 4-165 does not avail either defendant for their egregious conduct in connection with these counts. The court finds that a sufficient factual foundation is laid to grant relief to the plaintiffs as against these defendants on these counts, said responsibility is personal to them. Their actions under these counts CT Page 9694 fall into the wanton and wilful classification.
The statutory violations as alleged therein are proven, but solely provide a basis for personal liability of the defendants-Mills and Swett. Since negligence is not established, the negligence per se doctrine does not apply herein. For common law cause of action requisites see Nolin v.Morelli, 154 Conn. 432, 434, 226 A.2d 383 (1967). The same rationale applies with respect to Counts Three and Twelve alleging intentional infliction of emotional distress, while proven, create liability that only flows to the personal defendants-Mills and Swett, and not to the Commissioner.
With respect to Counts Five, Six, Seven and Eight (Mills) and Fourteen, Fifteen, Sixteen and Seventeen (Swett), the plaintiff concedes, and the court concurs, that Counts Six and Seven as to Mills and Fifteen and Sixteen as to Swett do not state a cause of action upon which the court could grant relief. Accordingly, the court dismisses those counts.
As to the remaining Counts, Five and Eight and Fourteen and Seventeen, the evidence establishes a basis for a recovery as against the defendants-Mills and Swett. Said liability is personal to them since their conduct was wilful and wanton and also reckless. The abusive conduct of the defendants, as to the plaintiff, rises above negligence, and the plaintiff was in the class of people intended by the statute to be protected and the other elements as laid out in Maloney v. Lensink,213 Conn. 548, 570, 569 A.2d 518 (1990) and Gore v. People's SavingsBank, 235 Conn. 360, 375, 665 A.2d 1341 (1995) are established by the evidence. As previously noted, the liability created herein flows only to the defendants-Mills and Swett personally, and not to the Commissioner.
With respect to Count Nine (Mills) and Eighteen (Swett), the evidence establishes that these defendants each treated the plaintiff in an offensive, hostile and harmful manner which put the plaintiff in apprehension of imminent serious bodily harm and caused the plaintiff to suffer injuries. Each defendant with force or violence did bodily offense to the plaintiff and each had the present ability to complete said acts; and intending to cause harm to the plaintiffs person, a harmful contact with the plaintiffs body resulted. Altieri v. Colasso, 168 Conn. 329,362 A.2d 798 (1975). The plaintiff having sustained his burden of proof with respect to these assault and battery counts, the liability created thereunder flows only to the defendants-Mills and Swett personally, and not to the Commissioner.
With respect to Count Nineteen, it is alleged that the Commissioner is responsible on the theory of negligence on the several allegations of CT Page 9695 negligence made with respect to his employees other than Mills and Swett. This court finds that the inaction of Linda Adametz and Debra Fraser constituted a serious deviation from the standard of care demanded of these employees of the DMR in connection with their obligation to report effectively and adequately their observations and conclusions that Steven was being abusively treated by the defendants-Mills and Swett. By their testimony, it is found that they had some fear and suffered intimidation, particularly from the defendant-Swett, which fear does not provide an adequate excuse for their failure to act in a reasonably prudent manner in connection with their obligation to report abusive and aversive treatment of the plaintiff. The totality of the evidence establishes that several DMR workers at Cuprak were aware that Steven was being abused. An effective report of this to supervisory and/or managerial personnel within the department was not made until Fraser contacted Ballard on June 15, 1995. It is notable that upon that report being filed, Swett and Mills were relieved of their duties within twelve hours. Had such an adequate and reasonable report been made to appropriate managerial or supervisory personnel within the department at an earlier time than June, 1995, the court concludes that action could and would have been taken in order to avoid and terminate the abusive and aversive treatment being practiced upon the plaintiff by the defendants-Mills and Swett. These employees' actions allowed for the care and treatment of Steven to deviate from the approved treatment plan prescribed for his benefit. Further, their negligence allowed a continuation of the force and physical restraint used upon Steven that was unnecessary and excessive and said treatment of him that was contrary to standard and recognized principles and practices of care and treatment of mentally retarded persons. These employees' failure to act constitutes negligence imputable to the Commissioner under General Statutes §19a-24. This scenario creates an adequate foundation in the evidence for the court to find the Commissioner responsible on account of the negligence of these DMR employees.
Further, the team having early been alerted that Steven was at risk for abusive treatment, failed to follow-up more closely as his situation demanded to detect abusive treatment or mistreatment of him by any department employees.
It is concluded that the Cuprak Group Home was originally intended as a temporary residence for Steven who was profoundly retarded and who was housed therein with another patient with whom he had ongoing hostility for a long, prior period of time. The failure of the employees of the DMR to provide reasonable facilities to obviate this small temporary group home setting constituted negligence. In addition, after June, 1995, when the had been commenced, and the defendants-Mills and Swett had been terminated, the defendant-Commissioner and/or his employees failed to CT Page 9696 move Steven from Cuprak to another adequate facility in order to remove him from the scene of this abusive and devastating treatment that he had received at the hands of Mills and Swett. This failure to act in a reasonable and prudent manner in connection with the provision of ongoing care to Steven exacerbated the damage done to him as hereinafter discussed. It is to be noted that he was not moved to another group home until February of 1999.
With respect to Count Twenty which alleges that the Commissioner's conduct and that of his agents, servants or employees constituted gross negligence or recklessness, this court does not find such conduct established by the evidence. Their joint and several conduct is grounded in negligence. Accordingly, Count Twenty is dismissed.
In Count Twenty-One, plaintiff alleges responsibility on the part of the Commissioner by virtue of negligent hiring and supervision. The failure of the DMR to conduct record checks in connection with prior criminal activity on the part of defendants-Swett and Mills was negligent. It is no excuse to say that the lies recorded by Mills were on an application for re-employment, whereas in Swett's case, it was in connection with his original employment. These persons were being hired to do a difficult and demanding job. They were going to be charged with the care, custody and control of very defenseless and dependant persons who were unable to provide for themselves due to their mental retardation. Each of these defendants had multiple incidents during the course of their employment wherein investigations were conducted and reprimands were imposed. Nothing appears in their record to indicate that, at any time prior to the events in question here, any managerial or supervisory personnel undertook any reasonably scrutinous look at the employment actions of these individuals to make a determination and/or a redetermination that they were reasonably fit to render care to these vulnerable patients, such as the plaintiff herein. In addition, in connection with the failure to do a criminal record check at the outset, it would appear that this would have been a red flag to the Commissioner that these two employees having lied on their employment applications represented people over whom a closer scrutiny ought to be exercised.
The court concludes that the Commissioner and/or his managerial and supervisory employees were negligent in this regard and said negligence allowed for the abusive treatment to be practiced upon Steven as hereinbefore set forth.
With respect to Count Twenty-Two, which alleges gross negligence and reckless hiring and supervision by the Commissioner, this court concludes that the evidence does not provide an adequate foundation for the court to conclude that the Commissioner or his representatives, agents, CT Page 9697 servants or employees were guilty of gross negligence or recklessness in connection with the allegations therein.
In connection with Count Twenty-Three, which alleges a statutory violation of General Statutes § 17a-238, there is no law that establishes a cause of action sounding in negligence in connection with § 17a-238. This court declines to establish such a cause of action particularly in view of the fact that this statute mirrors General Statutes §§ 17a-542 and 17a-541, which only sound in allegations above negligence. This count is dismissed as against the Commissioner.
In connection with Count Twenty-Four, which alleges negligent or unintentional infliction of emotional distress by the Commissioner against Steven, the court finds that the evidence provides an adequate foundation for liability pursuant to General Statutes § 19a-24. The failures on the part of DMR personnel to report and the negligent hiring and supervision by the Commissioner as aforesaid, create liability under this count based on negligence. The Commissioner knew or should have known that such actions involved an unreasonable risk of causing Steven to suffer emotional distress and, as a result, bodily injury and the Commissioner's actions and/or inactions caused the plaintiff to suffer emotional distress. The court finds that the Commissioner negligently breached a duty owed to the plaintiff; the Commissioner should have realized that his conduct involved an unreasonable risk of causing emotional distress to the plaintiff and the Commissioner should further have realized that the distress, if it were caused would result in illness or bodily harm. The harm suffered by the plaintiff herein was foreseeable to the defendant-Commissioner, his agents, servants and/or employees.
With respect to the plaintiffs, Emanuel and Connie Pattavina, Counts Twenty-Five, Twenty-Six and Twenty-Seven assert the cause of action for negligent infliction of emotional distress by each of the individual named defendants, as well as, the Commissioner. These allegations do not bring the present case within the framework of a line of cases alleging bystander emotional distress. Clohessy v. Bachelor, 237 Conn. 31,675 A.2d 852 (1996). The difficulties raised hereunder is whether or not the parents and legal guardians of a mentally retarded adult, who was physically and emotionally abused by his caretakers, may assert a cause of action for negligent infliction of emotional distress arriving out of such abuse on their own behalf.
This tort was first recognized in Connecticut in Montinieri v. SouthernNew England Telephone Co., 175 Conn. 337, 398 A.2d 1180 (1978). InMontinieri, recovery for emotional distress did not depend upon ensuing physical injury or risk of harm from physical impact. The plaintiff had CT Page 9698 the burden of pleading and proving that, "[t]he defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm. The tort arises where it is based upon unreasonable conduct of a defendant which transgresses the bounds of socially tolerable behavior." Parsons v. United Technologies Corp.,243 Conn. 66, 89, 700 A.2d 655 (1997).
The scenario presented by the facts established in this case presents a case of first impression in this jurisdiction. Can the parents of a mentally retarded child, who is now an adult, assert a cause of action for negligent infliction of emotional distress caused to themselves by negligent, abusive, wanton and wilful conduct of the defendants perpetrated upon their severely retarded son.
One of the principles underlying discussion in the review of cases alleging bystander emotional distress has been the wariness of the courts in these matters and their ability to weed out fraudulent claims.
Judge Levine, in a thoughtful and well-conceived exposition of the principles of tort law associated with these claims concluded that where there is a duty and a breach of that duty, and when it is reasonably foreseeable that illness or bodily harm could result, a cause of action exists notwithstanding the lack of contemporaneous sensory perception of the subject behavior. Doe v. Cuomo, 43 Conn. Sup. 222, 649 A.2d 266
(1994). That court analyzed the parents' claims for negligent infliction of emotional distress based upon traditional negligence principles: (1) whether the defendants owed a duty to the plaintiff-parents; (2) whether the defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress to them; (3) whether such distress may result in illness or bodily injury to the plaintiffs, and (4) whether the plaintiff-parents suffered damages.
There is no question but that the defendants-Swett and Mills owed a duty to the plaintiff-parents herein to provide adequate and reasonable care for their son. These parents had surrendered the care and maintenance of their profoundly retarded son to the State of Connecticut at the age of 3 years. In making that decision they initially repose a great deal of trust in the state to adequately care for their son. Over the ensuing 35 years, trust was enhanced and made more sacred to them, as his retardation became more profound and as their realization that he would never recover and would be dependent upon others for parental type care for the remainder of his life. These parents, particularly Mr. Emanuel Pattavina, remained closely involved in their son's care to the extent that they visited him very often, they requested and received progress reports quarterly from the DMR and were involved in attending CT Page 9699 some meetings of the team designed to review and enhance his treatment plan. Emanuel Pattavina demonstrated at the trial that he and his wife had come to truly rely on the State of Connecticut to care for their severely disabled son. Regardless of the fact that chronologically Steven has attained the age of majority many years ago, he still remains within their very reasonable concept as their child who is still very young and underdeveloped and who still requires careful and nurturing, parental type care. They have relied for many, many years on the State of Connecticut to provide such care and treatment for him.
The state was further required to keep these plaintiffs apprized of his progress and resolution of any problems that resulted from the needs of Steven's ongoing care. All of the defendants herein owed to these plaintiffs the duty to provide their son with a physically safe environment. Further, they owed the duty to promptly communicate any alleged abuse or mistreatment to the parents and guardians of this retarded patient.
As Judge Levine pointed out, "[t]he relationship between parent and child is constitutionally protected." Doe v. Catholic Family Services,Inc., 36 Conn. Sup. 93, 95, 412 A.2d 714 (1979). From a very practical and operative standpoint, Steven remained the child of these plaintiffs and fear or grief for one's child is as likely to cause physical injury as concern over one's own well-being.
Knowing as they did that their conduct involved an unreasonable risk of causing distress to the plaintiffs legal guardians, Emanuel and Connie Pattavina, they also must have realized that such distress, if caused, would result in emotional injury to the plaintiffs. This rationale or nexus existed between these plaintiffs and all of the named defendants.
With respect to Counts Twenty-Five (Mills) and Twenty-Six (Swett), which allege negligent infliction of emotional distress to the plaintiffs Emanuel Pattavina and Connie Pattavina, the court concludes that, as a result of their entrustment to the DMR of Steven, and as a result of the statutory mandates regarding the care and custody of a person placed with DMR, these defendants owed a duty to Emanuel and Connie Pattavina to properly and adequately protect and care for Steven. They knew or should have known that their actions involved an unreasonable risk of causing Emanuel and Connie Pattavina to suffer emotional distress and, as a result, bodily injury. Their actions proximately caused Emanuel and Connie Pattavina to suffer emotional distress. This court understands and finds that Emanuel and Connie Pattavina did not, in fact, witness the abuse. These defendants negligently breached the duty owed to these plaintiffs to properly and adequately protect and care for their son. These defendants should have realized that their conduct involved an CT Page 9700 unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in illness or bodily harm to these plaintiffs. Accordingly, this court finds that the evidence provides an adequate basis for these plaintiffs to recover as against the defendants-Mills and Swett, on the basis of the allegations stated in these two counts.
In connection with Count Twenty-Seven, which alleges negligent affliction of emotional distress on the plaintiffs Emanuel and Connie Pattavina as against the defendant-Commissioner, it is found that, as a result of Steven's placement and entrustment to the DMR, and as a result of the statutory mandates regarding the care and custody of a person placed with DMR, the Commissioner owed a duty to Emanuel and Connie Pattavina to properly and adequately protect and care for Steven; to timely notify them of the occurrence of any incident relating to the abuse of Steven and to provide them with accurate documentation and records relative to Steven's care. The Commissioner knew or should have known that his actions involved an unreasonable risk of causing Emanuel and Connie Pattavina to suffer emotional distress and, as a result, bodily injury. The negligence of the Commissioner as aforesaid in connection with the negligent acts of his employees for failure to report and negligent hiring and/or supervision, provide a basis for these plaintiffs to recover under this count. The Commissioner breached a duty owed to these plaintiffs and he should have realized that his conduct involved an unreasonable risk of causing emotional distress. The defendant should further have realized that the distress, if it were caused, might result in bodily harm or illness. Accordingly, this court finds an adequate foundation in the evidence to allow recovery on the part of these plaintiffs as against the Commissioner as alleged in this count.
In addition to these findings, the court finds that the Commissioner, his agents, servants and employees owed a statutory, as well as a common law, duty to properly care for, treat and protect Steven from harm. Section 315 of the Second Restatement of Torts provides that there is generally no duty to control the conduct of a third person to prevent harm to others unless there is a special relationship giving the injured party a right to such protection. This section illustrates that these types of relationships are similar to innkeepers, common carriers, police and like persons. Where one of these types of relationships exist, there is a duty to so control the intentional conduct of third parties. The court finds that the nature of the Commissioner's relationship with Steven is similar to those above described. Accordingly, pursuant to said Section 315 of the Second Restatement of Torts, the Commissioner and his employees owed a duty to Steven to control the conduct of their employees which could act to cause injury to Steven. CT Page 9701
The Commissioner, his agents, servants and/or employees breached their duties to provide Steven with humane, dignified, and proper care as well as their duty to protect him from harm. The Commissioner knew when Steven was placed at Cuprak that he was vulnerable, fragile, and likely to have been previously abused, a target for future abuse, and in need of special staff who were extremely patient, understanding and able to maintain a great deal of self-control. The Commissioner breached these duties owed to Steven Pattavina in that Swett and Mills were assigned to care for Steven at the Cuprak Road Home and were allowed to remain in said Home when the Commissioner and/or his agents knew or should have known that Mills and Swett, (1) had documented prior histories of violence toward DMR clients and patients in their care had previously committed acts of violence toward their co-employees; (2) had destroyed and damaged group home property; (3) made threats and committed acts of retaliation against reporting co-employees, and (4) possessed short tempers and made statements at team meetings that Steven responded to fear and intimidation. The Commissioner further knew or should have known that they had failed to disclose in their employment applications information concerning criminal convictions that may well have resulted in their not having been hired. In assigning Mills as Swett's supervisor, the Commissioner assigned one abuser to monitor the conduct of another. Further, the Commissioner was negligent and breached his duty to Steven by allowing him to remain living in Cuprak for approximately 3 years after the abuse was discovered, and without moving Steven from the Home or getting him appropriate medical treatment to deal with the psychological effect of his tormentors' abuse.
The actions of the defendants-Swett and Mills and the Commissioner, and/or his agents, servants and employees, proximately caused the damages and injuries sustained by all of the plaintiffs herein. The actual acts of abuse were carried out by Swett and Mills. Their co-employees failure to timely report the same, were acts performed as employees and agents of the Commissioner, and the Commissioner is therefore liable for the same. Even if the claim were to be made that said acts were beyond the scope of their employment, when applying the rule as stated in Section 442b of the Restatement (2nd) of Torts, said acts and omissions are not superceding intervening causes so as to relieve the Commissioner from liability for the risk he created.
With respect to the plaintiff, Steven Pattavina, he suffered and sustained physical injuries in the form of punching, kicking and/or other abusive tactics at the hands of Swett land Mills, as well as injuries resulting from their having, on several occasions, applied sleeper-holds to him rendering him unconscious or semiconscious. Further, he sustained emotional distress as a result of their conduct and was seen on occasion CT Page 9702 to flinch or shy away from either or both of them as they approached him.
Steven was examined by Dr. James Marikangas who presented testimony during the course of the trial, and whose testimony the court finds to be credible and reliable. He conducted an examination of Steven and concluded that he was severely retarded and that he could make gestures and some form of sign language. He reviewed Steven's records including the records at the group home, as well as, his medical records and deposition of the various witnesses and medical witnesses that had been taken in conjunction with the preparation of this case for trial. He reviewed his behavioral charts over the years and concluded that Steven had suffered multiple instances of abuse by workers as outlined in the evidence. He had been hit in the head, had sleeper-holds applied to him, had been kicked in the groin and hung upside down over a balcony. Furthermore, his fingers had been bent back to the extent that he was injured and felt injury therefrom. Dr. Marikangas concluded that this plaintiff, based on reasonable medical probability, suffered from post traumatic distress disorder as a result of these inhumanities practiced upon him by the defendants. That Steven suffered and sustained these injuries, damages and losses during a period of December, 1993 through June, 1995, is established. Further, even in view of his profound retardation, this plaintiff was capable of being able to physically and emotionally experience these injuries as a result of this abusive treatment. As a result of this treatment, the plaintiff withdrew and sustained periods of depression. This reaction was related to his inability to speak, and therefore, he was more vulnerable and powerless to control and/or do anything about this type of treatment being practiced upon him. It is found that this abuse was magnified by the extreme retarded condition that Steven suffers from. These adverse effects and injuries suffered by Steven were caused by and due to the abusive treatment of the defendants-Swett and Mills, and the negligence of the Commissioner and/or his agents, servants or employees as herein spelled out.
When Steven was removed from the abusive treatment of these individuals, his condition began to improve, along with some changes in medication that helped him to improve. The social changes offered to Steven were more productive of his partial recovery than the changes in medication.
This abusive treatment was heightened by the fact that this very fragile individual suffered these injuries and damages while in the sanctity of the group home, which was the place that was supposed to provide sanctuary and security for him. He had nowhere to flee to. This abuse was heightened over any similar abuse that one like Steven might CT Page 9703 have suffered on the street or outside the home. He continued to suffer from these experiences, pain and anxiety, at least up through February of 1999. He experienced and re-experienced the pain of this abuse. Having been kept at the site of the abuse for a long period of time after it was physically stopped, he continued to re-experience the results of it and they were reinforced from time to time. The court finds that these injuries and losses sustained by this plaintiff are permanent in nature as a result of this abusive treatment. Their effects will be lifelong. It is further found that his life expectancy is 34 years and that neither his underlying retardation condition or the injury suffered herein should disturb the operation of a normal life expectancy for him.
The court further finds that the charges and fees proffered by Dr. Marikangas in the amount of $4,750.00 are reasonable under all the circumstances and are approved by the court for payment.
Judgment is entered in favor of this plaintiff, Steven Pattavina, as against all defendants as follows:
 Past economic damages $ 100.00 (nominal) Past non-economic damages $ 500,000.00 Future economic damages $ 100.00 (nominal) Future non-economic damages $ 200,000.00 ____________ TOTAL DAMAGES: $700,200.00
Further, this court finds that the evidence provides a rational basis for an award of [punitive damages. The abusive conduct of the defendants-Swett and Mills, as practiced upon this plaintiff, is wanton and wilful beyond question. With respect to the Commissioner and/or his negligence by virtue of General Statutes § 19a-24, there is nothing therein that precludes the award of punitive damages. This court finds that along with the basis as herein set forth, that the collective action over a long period of time of the Commissioner's agents form a rational basis for a punitive damage award to be the responsibility of the Commissioner, as well as, the other defendants. Accordingly, punitive damages against all defendants are assessed and awarded in the amount of $250,000.00 as attorney's fees and $10,000.00 as fees for the guardian ad litem.
The plaintiff-parents have individually suffered damages as a result of the mistreatment of their son, Steven. Connie Pattavina did not testify at the trial, the court observed her during several days of her attendance and notes that she appeared very dejected and exhausted. She was seen by Dr. Brendon Mantano and treated for emotional distress suffered after learning that her son Steven had been abused at the hands CT Page 9704 of his caretakers. She had reluctantly gone to see Dr. Mantano who diagnosed her as having an anxiety and adjustment reaction which although not rising to the level of a major depression, did cause her emotional upset. Based on reasonable medical probability he related that this adjustment disorder and anxiety reaction was caused by the abuse that had been practiced on her son Steven and that when she visited him subsequently she was constantly reminded of this.
As a direct result of the conduct of the defendants as aforesaid, the plaintiff, Connie Pattavina, has suffered injuries and damages by virtue of the infliction of emotional distress. Judgment is entered in favor of the plaintiff, Connie Pattavina, to recover of all defendants as follows:
 Past economic damages $ 100.00 (nominal) Past non-economic damages $ 40,000.00 Future economic damages $ 100.00 (nominal) Future non-economic damages $ 10,000.00 ___________ TOTAL DAMAGES: $ 50,200.00
The court now turns to the causes of action alleged on behalf of the plaintiff, Emanuel Pattavina. First, the court finds that the DMR having initiated an investigation in June of 1995 into the abusive treatment of Steven, did not notify this plaintiff until a very substantial time later. Although the evidence is conflicting, the court finds that the first time that Emanuel Pattavina was made aware that there was any question of, or investigation into abusive treatment of his son, was on May 5, 1996 when he was visiting a friend, Maureen Murray. At the time, a daughter-in-law came into her home and announced that Channel 3 News had announced that an investigation was ongoing concerning the abusive treatment of retarded patients at the Cuprak Home where Steven was a resident. Mrs. Murray described Mr. Pattavina as being in total shock and turning white as a ghost upon hearing thiS.
He later confirmed by way of conversation with Ms. Sullivan at the south eastern region office that indeed an investigation of abuse was underway and she faxed to the plaintiff copies of the New London newspaper articles. At this point, Emanuel Pattavina felt very embarrassed and guilty as a parent and was very concerned about this matter. This indeed was a shocking way for him to learn about the allegations concerning treatment of his son.
Accordingly, the court finds that the Commissioner and/or agents, servants and employees violated their own regulations and were guilty of negligence in connection with this plaintiff by failing to reasonably CT Page 9705 inform him of the ongoing serious questions of the care being afforded to his son and indeed the serious investigation being undertaken in connection with allegations with abusive treatment. The rationale of the cause of action of negligent infliction of emotional harm appertains to this plaintiff also.
This plaintiff was also treated by Dr. Brendon Mantano for emotional distress. Dr. Mantano diagnosed Emanuel Pattavina as having suffered a major depression as a result of Steven's abuse. Dr. Mantano's evidence is credible and the court finds that based on reasonable medical probability the depression that Mr. Pattavina suffered was proximately [caused by his having learned that his son Steven had been abused by his son's caretakers while under the custody of the DMR. Dr. Mantano said he suffered a major depression with adjustment disorder, along with anticipation anxiety with insomnia. The major contributing factors to the development of these conditions were concerns about his son's ongoing care and guilt and anxiety over the abuse practiced upon him. This emotional distress is likely to be permanent in nature.
Judgment is entered in favor of the plaintiff, Emanuel Pattavina, to recover of all defendants as follows:
 Past economic damages $ 500.00 Past non-economic damages $ 75,000.00 Future economic damages $ 100.00 Future non-economic damages $ 25,000.00 ___________ TOTAL DAMAGES: $100,600.00
Thus, having found that the plaintiffs have sustained their burden of proof in connection with their allegations as against the defendants, judgment is entered in their favor as hereinbefore set forth.
Judgment is entered in favor of the plaintiffs in connection with the allegations of the Second Special Defense filed by the Commissioner of the DMR.
Judgment is entered in favor of the defendant-Commissioner as it relates to General Statutes § 17a-542 only.
It is so ordered.
HIGGINS, J. CT Page 9706