Catherine MARTIN, et al., Plaintiffs

v.

**SHELL OIL COMPANY,**
et al., Defendants.

No. CIV.A.3–99–CV–1428(JCH).

United States District Court,
D. Connecticut.

Jan. 10, 2002.

Anthony F. Dipentima, Guion, Stevens & Rybak, Litchfield, CT, Gina M. Von Oehsen, Garrett & Von Oehsen, Stamford, CT, Russel H. Beatie, Jr., Curt D. Marshall, Beatie & Osborn, New York City, for Plaintiffs.

Paul D. Sanson, Peter W. Benner, Shipman & Goodwin, Hartford, CT, Steven C. Dubuc, Anthony King, Richard E. Wallace, Jr., John W. Kampman, Wallace, King, Marraro & Branson, Washington, DC, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 109] AND MOTION IN LIMINE [DKT. NO. 112]

HALL, District Judge.

This case arises out of the discovery of a chemical known as methyl tertiary-butyl ether ("MTBE") in the groundwater near a Shell service station. The plaintiffs, Catherine Martin and Dorinda Frugé (collectively "Martin"), allege that the MTBE found in their wells is attributable to the defendants, Shell Oil Company and its successor-in-interest, Motiva Enterprises, LLC (collectively "Shell"). Martin's complaint lists six causes of action: negligence, negligence per se, strict liability, gross negligence, private nuisance, and trespass.[1]

In its motions, Shell argues that Martin's experts on causation should be excluded because their opinions are scientifically invalid, contrary to the evidence, and generally inadmissible. Further, Shell seeks summary judgment on Martin's claims because she lacks proof of causation and damages and based on other grounds specific to each claim. Martin contends that her experts are admissible and that she has sufficient evidence of causation and damages and defends each cause of action. Martin also advocates a different standard for proof of causation and admissibility of expert testimony, which the court addresses in this ruling.

## I. FACTUAL BACKGROUND

On March 25, 1992, the Connecticut Department of Environmental Protection ("CTDEP") issued an order finding that Shell owned and maintained an underground storage tank at its 912 Danbury Road property in Wilton and that groundwater at that site was polluted with components of gasoline. For at least ten years, site-specific hydrogeologic investigations and groundwater monitoring have been conducted in the Shell Station area by the CTDEP and environmental consultants for the service stations and industrial facilities in that area. For the shallow overburden, data from monitoring wells at the Shell station and the Wilton Shopping Center have consistently demonstrated that groundwater flow is to the north-northwest at the station.

Catherine Martin lives in a home approximately 800 feet east of the Shell Station mentioned in the 1992 Order and has

---

1. Shell included the Second Amended Complaint's seventh count for fraud in its motion for summary judgment. Martin, however, withdrew that claim in January 2001.

lived at that location since 1975. Dorinda Frugé lives in a home approximately 1400 feet south of the Shell Station and has lived at that location since 1993. The only substance related to gasoline that has ever been detected in the plaintiffs' wells during the plaintiffs' residence is MTBE. While living at these properties, the plaintiffs allege that, based on the contamination, they suffer various health problems, their water has a bad taste or odor, the property is barren, and they fear they may develop cancer.

Gregory Shkuda ("Shkuda") is an environmental consultant with a doctorate degree in organic chemistry from New York University. Shkuda submitted an expert report on behalf of the plaintiffs that expressed his opinion that the MTBE contamination from the Shell Station had traveled south and east to contaminate the plaintiffs' property. He relied heavily on an analysis of the geology and groundwater flow of the Nutmeg River Valley and a distinction between shallow and deep bedrock groundwater flow.

Myron Mehlman ("Mehlman") is a toxicologist with a doctorate in chemistry from the Massachusetts Institute of Technology. Mehlman submitted an expert report on behalf of the plaintiffs that expressed his opinion that the MTBE contamination of the plaintiffs' property caused the plaintiffs' health symptoms. He did not examine the plaintiffs or perform any differential diagnosis.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994)). In assessing the record to determine if such issues do exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir.1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

For the motion in limine, the court evaluates the experts' reports under Rule 702 of the Federal Rules of Evidence. Fed. R.Evid. 702 (2001). The rule reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id.*

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), outlined the "gatek-

eeping" function to be performed by the trial judge in assessing the admissibility of expert scientific testimony under Rule 702. The essence of the trial court's function is to determine whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact in understanding or determining a fact in issue. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. With respect to what constitutes "scientific knowledge," the Supreme Court declined to articulate a "definitive checklist or test" and emphasized that "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 592, 595, 113 S.Ct. 2786. Nonetheless, the *Daubert* Court identified several factors to be considered by the trial court in determining whether a proposed submission is sufficiently reliable under Rule 702. *Id.* at 592–95, 113 S.Ct. 2786. These include whether the theory or technique offered can be tested; whether it has been subjected to peer review and publication; what the known or potential rate of error is; and whether it is generally accepted in the relevant scientific community. *Id.*

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court reemphasized that the gatekeeping inquiry "must be 'tied to the facts of a particular case' " and that *Daubert*'s list of factors "was meant to be helpful, not definitive." *Id.* at 151, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). Thus, it is in the trial court's discretion to apply the *Daubert* factors, and the court "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.

## III. DISCUSSION

### A. Causation and Damages

#### 1. *Expert Gregory Shkuda*

Shell challenges the relevance and reliability of Shkuda's opinion. As a relevance challenge to Shkuda's report, Shell argues that he has never visited the contamination site in the context of this litigation and uses data from a location seventy-five miles away while ignoring information gathered specifically from the Shell Station. As a reliability challenge, Shell argues that Shkuda did not conduct any hydrogeologic tests to validate his theory, that he extrapolated from a study that does not support his opinion, and that he did not perform a differential analysis to eliminate other possible sources of MTBE contamination.

Shkuda's report provides an explanation of how MTBE from the Shell Station site could have migrated to the plaintiffs' property, and he uses accepted techniques in analysis of chemical migration in groundwater flow. The defendants' relevance challenges focus on the source of Shkuda's data for his opinion. First, Shell claims that the Nutmeg River Valley is not the same river valley within which the contamination site and plaintiffs' property are located. Shkuda argues that the study, conducted by the United States Geological Survey of the Department of the Interior, provides a relevant and reliable basis for comparison because the Nutmeg River Valley has a similar geological setting to the Norwalk River Valley where the properties at issue are located. Second, Shell argues that by focusing only on the Nutmeg study, Shkuda ignored site-specific data on the groundwater flow at the Shell Station.[2] Shkuda, however, claims that he

---

**2.** Shell also cites the court's ruling denying class certification for the fact that the groundwater at the Shell station flows in only one direction, perhaps believing that the statements in the ruling amounted to a finding of fact. The court notes that the statement used

examined the data and formulated an explanation for why the site-specific data does not show a southerly or easterly flow by distinguishing shallow and deep bedrock groundwater flow.

■ The court concludes that Shkuda's opinion is relevant to whether the contamination at the Shell Station could have migrated to plaintiffs' property. While Shell's concerns may affect the weight that the fact finder will give Shkuda's opinion, they do not affect its admissibility because accepted scientific principles justify the relevance of the Nutmeg Study given the similarity of the geological setting of the contamination site and the study.

Shell's reliability objections focus on Shkuda's methodology. Shell argues that Shkuda did not test his explanation. Contrary to Shell's characterization that Shkuda failed to perform hydrogeologic surveys because the plaintiffs feared it would produce results contrary to his report, Shkuda explains that the surveys were not performed because they would cost $70,000–100,000 to complete. Shell also challenges the conclusions Shkuda draws from the Nutmeg study. Shell appears to believe that the only conclusions ascertainable from the Nutmeg study would be those made in the study itself. Shkuda, however, draws on the data in the study, his experience, and other published works in the field to explore a possible difference in groundwater flow at varying depths. Finally, Shell claims that Shkuda failed to perform a differential analysis to eliminate other possible sources of MTBE contamination.

The court concludes that Shkuda's opinion is reliable. The *Daubert* factors and scientific methodology require that an opinion be testable, not that it necessarily be tested. While the plaintiffs place themselves at risk of strong cross-examination, the underlying explanation is not flawed for failure to test an explanation, especially at a cost of $70,000–100,000. Further, reliance on published data, as part of scientific methodology, does not require an expert to draw the same generalized conclusions as the publisher, if a more nuanced approach would yield different results. Finally, Shell has not cited any case law for the notion that a differential analysis would be required of Shkuda. As with the relevance objections, Shell's reliability objections merely affect weight, not admissibility. For these reasons and based on the record before it, the court declines to exercise its discretion to preclude Shkuda from testifying at trial.

### 2. *Expert Myron Mehlman*

Shell challenges the relevance and reliability of Mehlman's opinion. As challenges to Mehlman's report, Shell argues that his opinion lacks sufficient factual foundation, that he did not perform a differential diagnosis and is not qualified to do so, and that his opinion establishes causation based solely on temporal association. Shell also claims that Mehlman is not qualified to give an opinion on medical monitoring.

Mehlman's report provides a basis for concluding that the MTBE contamination on the plaintiffs' property affected the plaintiffs' health and property, and he uses accepted techniques in toxicology. Shell challenges the relevance of Mehlman's report because, in the report and his deposition, he refers to MTBE in conjunction with other gasoline components as causing

by Shell reflected only the court's summary of the evidence before it, not a finding on those facts. More specifically, in this instance, the court was only summarizing the findings of

the CTDEP without any further analysis or resolution of disputes about that those findings in this case.

health problems. Shell points out that no other gasoline components have been found on plaintiffs' property, only MTBE. In his Declaration attached to Martin's response to the motion in limine, Mehlman clarifies that his studies illustrate that MTBE causes "acute adverse effects and illnesses in humans" and that these effects are "exacerbated" by the presence of other gasoline components. Decl. of Myron Mehlman ¶¶ 5, 6.

Shell also argues that Mehlman's report is not reliable because he did not perform a differential diagnosis and is not qualified to do so. Shell cites cases that require differential diagnosis; however, those cases often involved an attack on an expert with little expertise in the field or strong opposition from the scientific community to the expert's conclusions. *E.g., Mancuso v. Consol. Edison Co.,* 967 F.Supp. 1437, 1451 (S.D.N.Y.1997); *Rutigliano v. Valley Bus. Forms,* 929 F.Supp. 779, 786 (D.N.J.1996). Also, as Martin points out, specific causation, the question at issue in most differential diagnosis cases, may be established by other theories such as temporal association, which Mehlman invokes. *See generally Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 930–31 (8th Cir.2001). If Mehlman is not required to complete a differential diagnosis, he need not be qualified to do one.

Shell challenges Mehlman's reliance on temporal association, claiming it is an unreliable basis for causation. Shell argues that Mehlman's opinion rests solely on the notion of temporal connection. Mehlman asserts that he used his expertise and knowledge of toxicology, published materials in the field, and temporal association as the basis for his opinion that MTBE contamination caused plaintiffs' injuries.

■ The court concludes that Mehlman's opinion is admissible. The cases cited by Shell for the requirement of differential diagnosis and ignoring temporal association are distinguishable and often involved egregious instances of unqualified experts or wildly aberrant theories in a particular field. Mehlman has employed known and accepted toxicology methods to arrive at his opinion, and any arguments by Shell only affect the weight, not admissibility, of his testimony. For these reasons and based on the record before it, the court declines to exercise its discretion to preclude Mehlman from testifying at trial.

■ Shell also argues that Mehlman is not qualified to testify about medical monitoring, claiming he denied his expertise in that field during his deposition. Martin claims that Mehlman only denied his expertise in conducting medical monitoring, not in determining whether it would be appropriate. Martin cites Third Circuit cases that allowed a toxicologist or other non-medical experts to discuss the propriety of medical monitoring. *See In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 858–59 (3d Cir.1990); *Merry v. Westinghouse Elec. Corp.,* 684 F.Supp. 847, 851–52 (M.D.Pa.1988). Based on the record before it, the court concludes that Mehlman has sufficient expertise and admissible opinions on whether medical monitoring would be appropriate.

### 3. *Martin's Standards for Causation and Experts*

In the context of her response, Martin has raised two issues that the court will clarify before proceeding. First, Martin argues that a burden-shifting analysis for causation should apply in cases where the defendants failed to test their product before putting it on the market or to conduct tests after health hazards became known. The closest case cited by Martin involved a bench trial over gel bleed in breast implants. *Barrow v. Bristol–Myers Squibb,* 1998 WL 812318 (M.D.Fla. Oct. 29, 1998). The *Barrow* court considered an argument

that placing the burden on the plaintiff to show causation in toxic tort litigation would be unfair and would create a negative incentive for corporations to test their products because proof of causation would exist. *Id.* at *38. The court laid out an academically proposed alternative, but concluded that "despite this Court's view of the unfairness of placing the burden of proof as to causation on the plaintiff in a case such as this, the Court is bound to apply the law as it is presently constituted and to find that Plaintiff has failed to prove causation."

■ Other cases cited by the plaintiff for imposing the burden of proof for causation on the defendant refer to common-law theories. Common-law theories of joint causation may be invoked where multiple defendants engage in an activity and it would be unfair for the court to force the plaintiff to prove which defendant actually caused the plaintiff's injury. In these cases, the law has permitted shifting the burden to the multiple defendants. The case of *In re MTBE Products Liability Litigation,* 175 F.Supp.2d at 619–20 (S.D.N.Y.2001), explores the different bases for joint causation-alternative liability, market share liability, enterprise liability, and concert of action liability-in the context of MTBE litigation against several companies as potential sources of injury.

■ The plaintiff has presented no case law to support its argument that the burden for proving causation should shift to the defendant. The *Barrow* court recognized a potential policy problem with placing the burden on the plaintiff, but resorted, as must this court, to applying the law as it stands. Moreover, the basis for the common-law burden-shifting theories is inapplicable here. The theories seek to avoid the unfair situation where the plaintiff has no possible means of apportioning liability as to any one defendant in particular, which threatens to deny the plaintiff any recovery because causation as to each defendant is left unproven-even though liability can otherwise be established as to a set of potential defendants. Here the plaintiffs allege only one potential source for the MTBE on their property, which eliminates any problem of apportioning liability and thus any need for the burden-shifting theories. Therefore, Martin should not expect to rely on any theory of burden shifting for causation.

■ The other issue raised by Martin involved the standard of review for experts. Martin argues that the court should apply a lax interpretation of *Daubert* to plaintiffs' experts, but a stricter interpretation to defendants' experts because they failed to test their product during or after manufacture. The court notes that *Daubert* and Rule 702 do not contemplate any distinction between experts based on party status or conduct. The court serves its gatekeeping function by insuring that expert testimony is relevant and reliable. The two cases cited by Martin involve reasonable inferences that may be drawn and viable causes of action that may be pursued in light of defendant's conduct and public policy, but those decisions do not modify the admissibility of evidence. *See Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 154–55 (2d Cir. 1976); *Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 387–88, 568 N.Y.S.2d 550, 570 N.E.2d 198 (1991). Accordingly, the court concludes that both parties should be held to the same standard for the admissibility of expert testimony.

### 4. *Causation*

■ Across the board on all causes of action, Shell claims that as a matter of law, Martin has not proven causation. Shell cites the lack of site-specific data supporting Shkuda's explanation of how the

MTBE migrated from the Shell Station to plaintiffs' property and the lack of evidence that other gasoline components existed on plaintiffs' property sufficient to cause injury in conjunction with MTBE. Shkuda relies on a study of a comparable geological setting to arrive at his opinion and distinguishes the available site-specific data by differentiating groundwater flow at varying depths based on literature in the field. Further, Mehlman has stated in his Declaration that injury from MTBE does not require other gasoline components. The court has already concluded, based on their expertise and the record before it, that the experts' testimony would be admissible. Shell's citation of its own experts only raises material issues of fact that must be resolved by a fact finder.

### 5. Damages

As a final issue of general application raised in the motion papers, Shell argues that Martin has not presented any evidence of personal injury, other than symptoms, or disclosed experts on property damage. Also, Shell claims that plaintiffs failed to present evidence of irreparable harm to justify injunctive relief.[3] Finally, Shell disputes the viability of medical monitoring as a remedy absent proof of present injury, but contends that the plaintiffs cannot satisfy the standard for medical monitoring regardless of whether they must prove present injury. Plaintiffs argue that they seek damages for pain and suffering and that the plaintiffs, as owners of their homes, may testify as to the effect of the MTBE contamination on property values. Further, Martin argues that as a "continuing nuisance," the MTBE contamination would justify injunctive relief. Fi-

nally, Martin claims that Mehlman's report and testimony establish sufficient basis for a medical monitoring remedy to survive summary judgment.

 At oral argument, Shell conceded, as it must, that Martin need not present experts for pain and suffering. Symptoms are a sufficient basis for damages for future medical costs that can be proven by a preponderance of the evidence and for pain and suffering, to include fear of disease or illness, *Petriello v. Kalman*, 215 Conn. 377, 391–92, 576 A.2d 474 (1990) (fear of bowel blockage may be awarded if reasonable basis for that fear); *Goodmaster v. Houser*, 225 Conn. 637, 646–47, 625 A.2d 1366 (1993) (clarifying jury instructions for fear of disease or illness). Moreover, Martin does not need property damage experts because, as the owners, the plaintiffs may testify about the effect of different factors on their own property values and other property damage. *See Misisco v. La Maita*, 150 Conn. 680, 684–85, 192 A.2d 891 (1963).

Shell claims, however, that plaintiffs' statements in depositions and interrogatories indicated that plaintiffs had no personal knowledge of a diminution in property value for their properties. Shell argues that, if the plaintiffs' testimony would serve as the basis for property damage evidence, then plaintiffs' discovery statements lead to the conclusion that the plaintiffs' have no competent evidence on property damage. Reviewing the record, the court concludes that the statements cited by Shell fail to raise an issue about whether plaintiffs can provide competent testimony on property damage. In her deposition, Martin was asked a single question

---

**3.** In its motion for summary judgment, Shell also noted that Martin presented no evidence supporting her claim for injunctive relief to prohibit the distribution of gasoline with MTBE. At oral argument, Martin conceded

that legislation preempted that aspect of plaintiffs' injunctive relief. In a letter dated October 23, 2001, Martin confirmed that the claim for injunctive relief to prohibit distribution of gasoline with MTBE was withdrawn.

about diminution of property value; the question was not rephrased or clarified. Frugé was asked a similar question and responded that she had consulted at least one realtor, which indicates she may have relevant testimony. The court will not conclude, based on the scant record before it, that the plaintiffs have no competent evidence regarding damage to their property values.

 Injunctive relief requires no adequate remedy at law and irreparable harm absent relief. *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989). Harm of a continuing nature can justify a permanent injunction. *Id.* Moreover, continuing nuisances, such as the production of noises to the detriment of neighbors, may be grounds for a permanent injunction, even if there is some basis for calculating pecuniary damages in relation to the nuisance. *Tomasso Bros. v. Oct. Twenty–Four*, 230 Conn. 641, 649, 646 A.2d 133 (1994). The contamination of plaintiffs' property could be considered a continuing nuisance that would justify a permanent injunction. Therefore, there is a material issue of fact that precludes summary judgment barring Martin from seeking injunctive relief.[4]

 Finally, on the medical monitoring challenge, Shell acknowledges that the Connecticut Supreme Court has cited favorably a Third Circuit case that allowed medical monitoring in the absence of present injury. *Doe v. City of Stamford*, 241 Conn. 692, 699 n. 8, 699 A.2d 52 (1997) (citing *Paoli*, 916 F.2d at 852). Relying on the context of the *Doe* decision and subsequent superior court cases, Shell argues that medical monitoring absent present injury should be limited to workers compen-

sation cases. *See, e.g., Bowerman v. United Illuminating*, 1998 WL 910271, at * 10 (Conn.Super.Ct. Dec. 15, 1998). Martin argues only that Mehlman's testimony provides a sufficient basis for medical monitoring as a remedy if other actionable injuries exist. The court accepts Martin's representation and does not construe Martin's complaint and subsequent pleadings as requesting medical monitoring based on exposure as the sole injury and cause of action, the issue in *Doe* and *Bowerman*. Further, Mehlman's testimony raises a material issue of fact regarding whether medical monitoring would be appropriate as a remedy. Therefore, summary judgment barring Martin from pursuing medical monitoring as a remedy is denied.

## B. Individual Causes of Action

### 1. *Negligence*

 Shell denies it owes a duty to the plaintiffs. Under Connecticut law, a court determines whether a duty exists as a matter of law. *Waters v. Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996). The Connecticut Supreme Court set the following criteria for identifying a duty: (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. *Lodge v. Arett Sales Corp.*, 246 Conn. 563, 572, 717 A.2d 215 (1998). The Connecticut Superior Courts have applied

---

**4.** Shell also argues that the request for injunctive relief to connect plaintiffs to potable water is moot as to Catherine Martin because she has access to the municipal water supply.

Shell did not submit this fact as undisputed in its Local Rule 9(c)(1) statement and did not reference a document that would indicate she is currently connected to potable water.

these criteria to cases where defendants contaminate property. *E.g., French Putnam LLC v. County Envt'l Servs., Inc.,* 2000 WL 1172341, at *2–6 (Conn.Super.Ct. July 21, 2000) (declining to find a duty because the conflicting public policy of caveat emptor prevailed over the strong policy of environmental protection where suit brought by purchaser of property against lessees of the former property owner). Absent some countervailing public policy, Connecticut's strong interest against environmental contamination justifies imposing a duty on the defendant to reasonably store and maintain the gasoline on its property. Further, that duty would extend to owners of neighboring properties foreseeably affected by possible contamination. Therefore, summary judgment on the negligence count is denied.

### 2. *Negligence per se*

■ Shell claims that Martin has not satisfied the standard for negligence per se. A cause of action for negligence per se requires, in addition to typical negligence elements, that the defendant violate a statute, that the plaintiff be part of the class sought to be protected by that statute, and that the injury suffered by the plaintiff be of the type the statute was created to prevent. *Gore v. People's Sav. Bank,* 235 Conn. 360, 375–76, 665 A.2d 1341 (1995). Martin argues that the negligence per se standard would be satisfied by Shell's violation of the Connecticut Water Pollution Control Act ("CWPCA").

■ The CWPCA prohibits "pollution of any of the waters of the state." Conn. Gen.Stat. § 22a–427 (2001). There is a split of authority in the lower courts of Connecticut regarding the propriety of negligence per se actions pursuant to CWPCA. *Compare, e.g., Coastline Terminals, Inc. v. USX Corp.,* 156 F.Supp.2d 203 (D.Conn.2001) (allowing negligence per se based on CWPCA), *and Caprio v. Upjohn Co.,* 148 F.Supp.2d 168 (D.Conn.2001) (Eginton, J.), *and Mirarchi v. Jennings,* 1997 WL 297735 (Conn.Super.Ct.1997) (Mintz, J.), *with Reiser v. Island Transp. Co.,* 2000 WL 675615, at *3 (Conn.Super.Ct. May 2, 2000) (Radcliffe, J.) (holding that negligence per se does not include importing standards of care from the broad regulatory scheme of the CWPCA), *and Conn. Water Co. v. Town of Thomaston,* 1996 WL 168051, at *1–4 (Conn.Super.Ct. Mar. 4, 1996) (Corradino, J.) (same). Shell has not argued, however, that the CWPCA does not support a negligence per se action.[5] Shell only claims that Martin failed to present sufficient evidence of a statutory violation that caused plaintiffs' injury. Martin has presented evidence of groundwater pollution by Shell, and the court has permitted Martin's experts on causation. Therefore, summary judgment on the negligence per se count is denied.

### 3. *Strict Liability*

Shell contends that Connecticut does not recognize a strict liability claim for activities other than blasting and pile-driving. Further, Shell argues that even if other activities qualified for strict liability treatment, underground storage and use of hazardous materials is not an ultrahazardous activity. Martin claims, however, that the

---

**5.** There are cases that have barred a negligence per se action after concluding that no private right of action exists under the CWPCA. *E.g., Bernbach v. Timex Corp.,* 989 F.Supp. 403, 408 (D.Conn.1996). Whether a private right of action exists under a particular statute differs from the inquiry into whether that statute offers a standard of care for a negligence per se action. *Coastline Terminals,* 156 F.Supp.2d at 210 (citing *Walker v. Barrett,* 1999 WL 1063189, at *2–3 (Conn.Super.Ct. Nov. 8, 1999)). Therefore, the court does not address whether a private right of action exists under the CWPCA.

appropriate characterization of Shell's activity is the underground storage of hazardous material in a residential area with private water wells.

Under Connecticut law, the court determines whether an activity is ultrahazardous as a matter of law. As summarized by the Connecticut Appellate Court, the factors to consider in assessing an ultrahazardous activity are: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. *Green v. Ensign–Bickford Co.*, 25 Conn. App. 479, 486, 595 A.2d 1383 (1991). Not all the factors need to be present, especially if some weigh heavily in the balance, but at least several should exist. *Id.*

Other courts in this district have ruled that underground storage of hazardous materials is not an ultrahazardous activity. *Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. 435, 441–42 (D.Conn.1994); *Arawana Mills Co. v. United Tech. Corp.*, 795 F.Supp. 1238, 1251–52 (D.Conn.1992). Further, at least one Connecticut Superior Court has addressed underground storage in residential housing and concluded that it does not qualify as an ultrahazardous activity. *Mirarchi*, 1997 WL 297735, at *4–5. While the court does not consider Connecticut strict liability claims limited to blasting and pile-driving, the court concludes, based on the above authority, that underground storage of gasoline is not an ultrahazardous activity, even in residential areas. In particular, the court notes, as did the *Thomaston* court, that other

causes of action adequately protect plaintiffs from underground storage of gasoline because, with reasonable precautions, defendants can prevent leakage and contamination. *Thomaston*, 1996 WL 168051, at *6–7. This fact weighs heavily in the third factor of the *Green* test and is not outweighed by the specific circumstances of this case. Therefore, summary judgment on the strict liability count is granted.

### 4. *Gross Negligence*

Shell argues that no cause of action for gross negligence exists in Connecticut. Martin counters with several cases discussing gross negligence in the context of the Dram Shop Act. *See, e.g., Dufficy v. Mohring*, 1993 WL 512411 (Conn.Super.Ct. Dec. 7, 1993). The Connecticut Supreme Court has held that gross negligence is not a separate cause of action. *Decker v. Roberts*, 125 Conn. 150, 157, 3 A.2d 855 (1939). No Connecticut appellate court opinion has questioned *Decker*, and no lower court has disregarded it, outside the bartender liability context. Therefore, summary judgment on the gross negligence count is granted.

### 5. *Private Nuisance*

Shell challenges the sufficiency of Martin's evidence to satisfy the nuisance standard. Martin contends that nuisance is an extremely fact-intensive inquiry that would be inappropriate to decide on summary judgment. Further, Martin claims that the evidence presented establishes a private nuisance.

"To establish a nuisance four elements must be proven: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate

cause of the plaintiffs' injuries and damages." *Filisko v. Bridgeport Hydraulic Co.,* 176 Conn. 33, 35–36, 404 A.2d 889 (1978). In exceptional cases, a court may conclude as a matter of law that defendants did not create a dangerous condition. *Heritage Vill. Master Ass'n v. Heritage Vill. Water,* 30 Conn.App. 693, 709, 622 A.2d 578 (1993) (holding that a defendant supplying potable water did not create a dangerous condition). This case does not present that rare exception where the court can conclude that no reasonable jury would find for the plaintiff on all elements of the nuisance claim. There are several material issues of fact. Therefore, summary judgment on the nuisance count is denied.

### 6. *Trespass*

Shell claims that any invasion of land by the defendant was not intentional. Martin argues that substantial certainty that an activity will result in entry of foreign matter on another's property constitutes actionable trespass. Martin offers several articles and excerpts that state Shell knew about groundwater contamination from the Shell station before the 1992 CTDEP Order.

▮▮▮▮ "In order that there may be a trespass ... [i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter [on the property]." *Ahnert v. Getty,* 1997 WL 178064, at *4 (Conn.Super.Ct. Apr. 4, 1997) (quoting Restatement (Second) of Torts § 158 (1965)) (internal quotations omitted). Shell cites *Andrea v. Metropolitan District,* 2000 WL 1868211 (Conn.Super.Ct. Nov.28, 2000), for the intent requirement. *Andrea* involved an "accidental" contamination, however, so the court never addressed the substantial certainty aspect of a trespass claim. The *Andrea* court concluded that no form of

intent exists or can be inferred from "human error or mechanical failure." *Andrea,* 2000 WL 1868211, at *1. The substantial certainty alternative under the Restatement provides an inference of intent from what the defendant knew or should have known about its activities. Martin has raised a material issue of fact as to whether Shell knew or should have known about the contamination of plaintiffs' property. Therefore, summary judgment on the trespass count is denied.

## IV. CONCLUSION

For the foregoing reasons, Shell's Motion in Limine [Dkt. No. 112] is DENIED, and Shell's Motion for Summary Judgment [Dkt. No. 109] is GRANTED IN PART and DENIED IN PART. As to Counts 3 and 4 of the Second Amended Complaint, summary judgment is granted. In all other respects, Shell's Motion for Summary Judgment is denied. The court also rejects Martin's proposed standards for proof of causation and admissibility of expert testimony.

**SO ORDERED.**